[No. B216193. Second Dist., Div. Five. Nov. 16, 2010.]

LARRY R. STEWART et al., Plaintiffs and Respondents, v.
UNION CARBIDE CORPORATION, Defendant and Appellant.

24

## Counsel

Horvitz & Levy, David M. Axelrad, Mary-Christine Sungaila, Daniel J. Gonzalez; Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor, Kevin C. Mayer, Raul Perez, John M. Kennedy; Orrick, Herrington & Sutcliffe and Morton D. Dubin II for Defendant and Appellant.

Paul & Hanley, Dean A. Hanley, Kelly A. McMeekin, Anthony Vieira; Farrise Law Firm and Simona A. Farrise for Plaintiffs and Respondents.

## Opinion

**ARMSTRONG, J.**—Defendant and appellant Union Carbide Corporation appeals from the judgment entered against it and in favor of plaintiffs and respondents Larry R. Stewart and Janet Stewart, on the Stewarts' complaint. We affirm.

### Factual and Procedural Summary

Larry Stewart worked as a plumber, or plumber's apprentice, from 1968 until his diagnosis with mesothelioma in 2007. After his diagnosis, he sued Union Carbide (and others, who settled prior to trial) for fraud, negligence, and strict products liability on failure to warn and design defect theories. Janet Stewart, Larry Stewart's wife, sued for loss of consortium. Plaintiffs sought punitive damages.

At trial, Stewart testified that, throughout his career, he worked on large commercial and residential construction projects. He worked near drywallers on "just about every job." Drywallers use joint compound, and plaintiffs presented evidence that during relevant time periods, joint compound contained asbestos which was released when the walls were sanded. Stewart testified that on most of the jobs he worked on, the drywallers used joint compound manufactured by a company called Hamilton Materials, though USG joint compound was used in some instances. Plaintiffs presented evidence that USG and Hamilton Materials obtained asbestos from Union Carbide, which mined chrysotile asbestos in Coalinga, California, and sold that asbestos under the brand name Calidria.

Stewart described his exposure to asbestos from joint compound. Drywallers followed the plumbers, putting up walls as soon as the plumbers finished. The drywallers put up drywall, taped the joints, put joint compound over the tape and over the screws or nails, then sanded. Sanding created a fine dust, like talcum powder. The dust formed a white cloud, which got into hair and clothes and filled not just the room the drywallers were working in, but adjacent rooms. Laborers would come through to sweep, stirring the dust into the air and creating a duststorm. Once the sanding started, the job was "a total mess," with "dust everywhere." There was no way to avoid breathing this dust.

Stewart also testified that although he saw many boxes of joint compound during his career, he never saw a box with any warning about the hazards of asbestos, or even a warning that the compound contained asbestos, something he did not know. He never received any Occupational Safety and Health Administration (OSHA) warning, or any other warning, on that subject. Safety meetings were dedicated to such things as the hazards of extension cords and falling objects.

Stewart knew that construction sites would be dirty, but never knew that there was anything in the dust created by sanded joint compound that would be hazardous to his health. To the contrary, he assumed that if a product was available on the market, it was safe to use.

Stewart testified concerning the mentally and physically debilitating effects of his disease and of his treatment, which had included six rounds of chemotherapy, with three more rounds of experimental treatment recommended. He described the effect of his disease on his life and on his family.

Through expert witnesses, plaintiffs presented evidence that Larry Stewart's disease was caused by asbestos, that medical tests showed that there were asbestos fibers in his lungs, that such fibers are not found in the general

population, and that he had had a significant exposure to asbestos. Based on studies, plaintiffs' expert opined that a person exposed to dust created when asbestos-containing joint compound was sanded was at risk of mesothelioma, even if the person was a bystander.

Plaintiff also presented evidence on Union Carbide's knowledge of the dangers of asbestos, economic damages and other issues.

At the close of evidence, the trial court directed a verdict for Union Carbide on the cause of action for fraud. The case went to the jury on causes of action for negligence and strict products liability on both failure to warn and design defect/consumer expectations theories. The jury found for plaintiffs on all those causes of action. The jury was asked to allocate fault between a large number of entities, described in the briefs herein as suppliers of asbestos-containing materials, and found that Union Carbide accounted for 85 percent of the fault, and Hamilton Materials for 15 percent.

The jury awarded Larry Stewart $2.2 million for past and future economic damages, and $500,000 for past and future noneconomic damages, and awarded Janet Stewart past noneconomic damages of $250,000 and future noneconomic damages of $250,000. For purposes of punitive damages, the jury also found that Union Carbide had acted with malice, oppression, or fraud. After a trial on punitive damages, the jury awarded $6 million in punitive damages.

After applying $1,782,375 in credits based on the preverdict settlements with other defendants and making appropriate calculations based on Union Carbide's 85 percent share of fault,[1] the court entered judgment in favor of Larry Stewart in the amounts of $417,625 in economic damages and $425,000 in noneconomic damages and $6 million in punitive damages, and in favor of Janet Stewart in the amount of $425,000 in noneconomic damages. Union Carbide's posttrial motions for judgment notwithstanding the verdict and for a new trial were denied.

## Discussion

### A. The "sophisticated purchaser defense" to failure to warn

Union Carbide asked the court to instruct the jury on what it calls a sophisticated purchaser defense, and on appeal argues that the court wrongly

---

[1] The court's nine-page ruling on plaintiffs' posttrial motion to determine judgment credits and enter judgment and defendant Union Carbide's motion for modification of judgment to reflect application of settlement credits, reflects $4.375 million in settlements and details the methods the court used to arrive at the correct credits.

refused the instruction. There is some controversy concerning the instructions actually presented to the court,[2] but in general, Union Carbide asked to have the jury instructed that "where the risk of using a hazardous product is already known, or should be known, by the purchaser of that product, the product supplier has no duty to warn of the product's potential hazards," that a bulk supplier's or raw materials supplier's duty to warn "is measured by what is generally known or should be known to purchasers of the raw product, rather than by the individual plaintiff's subjective knowledge," and that "the sale of a raw material to a sophisticated intermediary purchaser who knew or should have known of the risks of that raw material cannot be the legal cause of any harm the raw material may cause."

Union Carbide argues that such an instruction falls under the rationale of *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56 [74 Cal.Rptr.3d 108, 179 P.3d 905] and is suggested by that case. It is not. *Johnson*'s sole reference to a sophisticated purchaser is in a discussion of treatises and out-of-state cases. (*Id.* at p. 65.) Nothing in the discussion suggests the rule Union Carbide seeks.

■ In *Johnson*, the plaintiff was injured while repairing an air-conditioning unit, which had no warning of a dangerous condition that could arise during repair. However, the plaintiff was a professional, EPA-certified (Environmental Protection Agency), air-conditioning repair technician, who, the court concluded, could reasonably have been expected to know of just that danger. *Johnson* reiterated the rule that "manufacturers have a duty to warn *consumers* about the hazards inherent in their products" (*Johnson v. American Standard, Inc., supra*, 43 Cal.4th at p. 64, italics added), but recognized an exception to that rule, holding that "sophisticated *users* need not be warned about dangers of which they are already aware or should be aware." (*Id.* at p. 65, italics added.) In such circumstances, the court held, failure to warn was not the legal cause of the harm. Instead, "the user's knowledge of the dangers is the equivalent of prior notice." (*Ibid.*) The court held that "individuals who represent that they are trained or are members of a sophisticated group of users are saying to the world that they possess the level of knowledge and skill associated with that class. If they do not actually possess that knowledge and skill, that fact should not give rise to liability on the part of the manufacturer." (*Id.* at p. 71.)

*Johnson* did not impute an intermediary's knowledge to the plaintiff, or charge him with any knowledge except that which had been made available

---

[2] The record on the proposed instructions was sufficiently unclear that this court appointed the trial judge as a referee to conduct record correction proceedings. The referee's report convinces us that Union Carbide raised this issue, and that we disagree with plaintiffs' contention that the issue was waived.

to him through his training and which, by reason of his profession and certification, he should have had. In contrast, Union Carbide's proposed instruction is not based on the theory that Larry Stewart had the opportunity to acquire any knowledge of the dangers of asbestos, let alone the obligation to do so. Instead, it contends that its customers, Hamilton and USG, knew or should have known (from public sources) of the dangers of asbestos, and that its duty to warn Stewart is measured by the knowledge Hamilton and USG should have had. It is apparent that such a theory has nothing to do with *Johnson*.

■ Actually, the proposed defense is an extension not of *Johnson*, but of the bulk supplier/component parts doctrine. Under that doctrine, the manufacturer of a product component or raw material is not liable for injuries caused by the finished product unless it appears that the component itself was defective when it left the manufacturer. (*Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129 Cal.App.4th 577, 581 [28 Cal.Rptr.3d 744].) Asbestos suppliers have sought the protection of that rule, but it has not been afforded to them, because raw asbestos is a defective product. (*Jenkins v. T&N PLC* (1996) 45 Cal.App.4th 1224 [53 Cal.Rptr.2d 642]; *Garza v. Asbestos Corp., Ltd.* (2008) 161 Cal.App.4th 651 [74 Cal.Rptr.3d 359]; *Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1188 [74 Cal.Rptr.2d 580].) Union Carbide does not address these cases with any specificity, but only refers to plaintiffs' reliance on cases that predate *Johnson*. Union Carbide argues that after that case, even a bulk supplier's duty to warn "should depend on what the purchaser already knows or reasonably should know." As we have seen, however, *Johnson* was not concerned with the knowledge of the purchaser, but with the knowledge of the user. Union Carbide's argument is unpersuasive.

Union Carbide cites authority involving the liability of a supplier to an employee of a sophisticated purchaser who is the employer. The employer-employee relationship is different than the relationship between a sophisti-cated user intermediary and an unknown number of nonemployees who may at some point work with the sophisticated purchaser's product.

■ We note, too, that although Union Carbide alludes to the sophisticated intermediary doctrine, that doctrine, where it applies at all, applies only if a manufacturer provided adequate warnings to the intermediary. (*Carmichael v. Reitz* (1971) 17 Cal.App.3d 958, 989 [95 Cal.Rptr. 381]; *Persons v. Salomon North America, Inc.* (1990) 217 Cal.App.3d 168, 170–172 [265 Cal.Rptr. 773]; *Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 21 [56 Cal.Rptr.2d 455].) Union Carbide did not seek an instruction under that theory, but instead argued that it was entitled to rely on intermediaries to acquire their own knowledge and to provide their own warnings. We see no basis in law

for such an instruction. Union Carbide gave no warning and could not therefore rely upon the intermediary, even if sophisticated, to pass on or give warnings. If both Union Carbide and the sophisticated intermediary failed to give warnings, that should not absolve Union Carbide of responsibility.

In this portion of its brief, Union Carbide also argues that there was no evidence to support the jury's finding that USG used Union Carbide asbestos in the relevant time periods. In support, it provides several citations to the reporter's transcript. Most are to arguments of counsel. One is to actual testimony, part of plaintiffs' cross-examination of a defense expert witness, Donald Marano. In the cited portion of the record, Marano testified that Union Carbide *had* supplied USG with asbestos, but that he could not recall the time periods in which that happened. Union Carbide also cites evidence, from one of plaintiffs' experts, that USG removed asbestos from its joint compound by 1975. From this, Union Carbide argues that this was before Larry Stewart was exposed to USG joint compound at a Mission Viejo jobsite.

Union Carbide has not provided us with a full statement of the evidence, and for that reason alone cannot prevail on this contention. (*In re Marriage of Ananeh-Firempong* (1990) 219 Cal.App.3d 272, 278 [268 Cal.Rptr. 83]; *Estate of Hoffman* (1963) 213 Cal.App.2d 635, 639 [29 Cal.Rptr. 60].) We note, too, that our examination of the record reveals that Larry Stewart's testimony that he saw USG joint compound on jobsites was not limited to a Mission Viejo jobsite. In response to specific questions, he testified that during his apprenticeship and on several specified jobsites, USG joint compound was used about 10 percent of the time. Finally, the fact that Union Carbide's expert could not remember the relevant time periods does not establish that plaintiffs' evidence was deficient.

## B. The jury's allocation of fault

At the request of both parties, the court instructed the jury pursuant to CACI No. 406 that Union Carbide "claims that the negligence or fault of multiple other asbestos product manufacturers, suppliers, distributors, employers and/or contractors was a substantial factor in causing plaintiffs' harm. To succeed on this claim, Union Carbide Corporation must prove both of the following: 1. That those other asbestos product manufacturers, suppliers, distributors, employers, and/or contractors were negligent or at fault; and 2. That the negligence or fault of those other asbestos product manufacturers, suppliers, distributors, employers and/or contractors was a substantial factor in causing plaintiffs' harm. [¶] If you find that the negligence or fault of more than one person including Union Carbide Corporation, and one or more other asbestos product manufacturers, suppliers, distributors, employers, or contractors was a substantial factor in causing plaintiffs' harm, you must then decide

how much responsibility each has by assigning percentages of responsibility to each person listed on the verdict form. . . ."

The jury was asked, in question 21 of the special verdicts, "If 100% represents the total fault that was the cause of plaintiffs' injury, what percentage of this 100% was due to the fault of the defendant, Union Carbide Corporation, and other identifiable persons or entities named below?" Forty-seven such persons or entities were named. The jury allocated 85 percent of the fault to Union Carbide, 15 percent to Hamilton, and nothing to the other entities.

Union Carbide contends that the jury's allocation of fault should be set aside for three reasons: the court prejudicially erred when it failed to give a corrective instruction after plaintiffs' counsel's argument; the court prejudicially erred in its answer to a jury question; and there was no substantial evidence for the jury's findings.

### 1. *The jury instructions*

In closing, plaintiffs' counsel made arguments based on CACI No. 406, arguing that Union Carbide had not met its burden of proof and that there was no evidence that any of the other entities listed on the special verdict form bore any fault. The next day, after the jury had retired to deliberate, Union Carbide argued that counsel's argument was improper in that it suggested that Union Carbide bore the burden of proving specific percentages of fault. It asked the court to instruct the jury that "the argument of counsel is not the law in this case, the law is as I instructed you prior to closing argument of counsel. Should you find that the negligence or fault of more than one person was a substantial factor in causing plaintiff's harm, it is up to you to decide how much responsibility each has by assigning percentages of responsibility to each person listed on the verdict form."

The court refused the instruction, ruling that "it's within the fair bounds of argument to comment on the other side's failure to provide substantive evidence on a subject. And the jury instruction, though, is clear that the jury makes the decision. And I believe that, because of that, there's no need for further instruction."

On appeal, Union Carbide argues that the court's refusal to give the instruction constituted prejudicial error. We see none. The jury had already been instructed on everything in the proposed instruction: arguments of counsel are not the law, and the allocation of fault is for the jury to decide. The trial court had no reason to give the additional instruction and committed no error by refusing to give it.

Union Carbide's second argument on the jury instructions concerns an instruction given in response to a jury question.

After closing arguments, the jury was correctly instructed that "At least nine jurors must agree on each verdict and on each question that you are asked to answer. However, the same jurors do not have to agree on each verdict or each question. Any nine jurors is sufficient." After several days of deliberation, the jury asked a question: "Please clarify the jury instructions for Question 21 (percentages) specifically related to whether nine out of twelve jurors must agree on the same set of percentages in order to have a group decision. We are confused about how to answer this question since Union Carbide has the burden of proof and none of the other companies are Defendants in this case."

In response, the court told the jury "I believe that you're asking the court to clarify the jury instructions for the verdict form question number 21 as to whether 9 out of 12 jurors must agree on the same set of percentages in order to have a group decision. Well, your short answer is yes. The group has to look at the evidence and the jury instructions and then whatever percentages you agree to, depending upon what, if anything, you decide to allocate, has to be totaling a hundred. And all 9 or more have to agree to that set of figures." The court then reread the instruction under CACI No. 406, and instructed the jury that the fact that the other entities listed on the verdict form were not defendants made no difference. The court then asked all counsel whether anything else should be added, and each lawyer answered "no."

Union Carbide argues that the court thus instructed the jury that the same nine jurors had to agree to each percentage of fault. Acknowledging that this argument was not raised in the trial court, it also argues that under Code of Civil Procedure section 647, the instruction is "deemed excepted to." We do not see that we can deem an exception, where there was in fact an agreement. (*Perlin v. Fountain View Management, Inc.* (2008) 163 Cal.App.4th 657, 667 [77 Cal.Rptr.3d 743].) Moreover, we cannot agree that the court's answer to the jury's question was erroneous or in any way prejudicial. This jury was correctly instructed that "the same jurors do not have to agree on each verdict or each question. Any nine jurors is sufficient." The answer to the jury's question did not change that.

## 2. *Substantial evidence*

Union Carbide bases this argument on the evidence that Larry Stewart was exposed to asbestos-containing products supplied by other companies, through asbestos-containing roofing materials, pipe, gaskets, drywall, and insulation at work, and because he worked on his cars. Union Carbide then

cites some of plaintiffs' medical evidence, to the effect that all commercial asbestos fibers can cause mesothelioma, that the risk of mesothelioma is based on the cumulative effect of asbestos exposure, and that all of Larry Stewart's exposures caused his illness. Union Carbide concludes from this that fault should have been allocated to other entities, although it does not specify which entities or how much fault.

■   In our analysis, we start with the presumption that the record contains evidence sufficient to support the judgment. It is the appellant's affirmative burden to demonstrate otherwise. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) Union Carbide has not done so.

■   Under established law, which Union Carbide does not challenge, it "undisputedly had the burden to establish concurrent or alternate causes by proving: that [Larry Stewart] was exposed to defective asbestos-containing products of other companies; that the defective designs of the other companies' products were legal causes of the plaintiffs' injuries; and the percentage of legal cause attributable to the other companies." (*Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 478 [38 Cal.Rptr.2d 739].) As Union Carbide argues, the evidence was that Larry Stewart was exposed to other asbestos, and, as Union Carbide argues, plaintiffs said as much in closing argument. However, the jury could well have found that those exposures were not substantial factors in causing Larry Stewart's injury.

The statements in plaintiffs' closing argument that Union Carbide cites as judicial admissions in its favor demonstrate this. For instance, Union Carbide cites to the argument that (and here we put each statement in its context), "yes, he was exposed to other people's asbestos as well. But there is no question he had a significant exposure for many, many months, days, and years to what was asbestos from Union Carbide. And they continue to dispute that they have any responsibility whatsoever. . . . Every contribution to dose counts. Dr. Frank talked with you about that. And their claim is 'we have no role in that.' And that is just not true."

Counsel also argued "Yes, we do agree that he had other exposures. I told you that on the first day, I told you that in my opening and closing, and I will tell you that now. But I will tell you that it is not appropriate to put any numbers in there, because Union Carbide, who has the burden of proof, never gave you any evidence as how you should do it. They want you to speculate, ladies and gentlemen—maybe it's this, maybe it's that. It's their burden to produce evidence." Just so. The jury apparently found that Union Carbide did not carry its burden. It was entitled to so find.

## C.  Punitive damages

### 1.  *Substantial evidence*

■ Punitive damages can be awarded only where the jury finds oppression, fraud, or malice by clear and convincing evidence. (Civ. Code, § 3294, subd. (a).) As Union Carbide argues, we review a challenge to the substantial evidence for punitive damages with that in mind, and "inquire whether the record contains 'substantial evidence to support a determination by clear and convincing evidence . . . .' [Citation.]" (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891 [93 Cal.Rptr.2d 364].) However, as with any challenge to the sufficiency of the evidence, it is the appellant's burden to set forth not just the facts in its favor, but all material evidence on the point. " 'Unless this is done the error is deemed to be waived.' " (*Foreman & Clark Corp. v. Fallon, supra*, 3 Cal.3d at p. 881.) Union Carbide has failed in this obligation. It cites the evidence in its favor, points out the ways in which (it contends) it controverted or impeached plaintiffs' evidence, and interprets the evidence in the light most favorable to itself. It concludes that the evidence shows that it had an "honest conviction" that use of Calidria asbestos was safe when appropriate precautions were taken.

The jury could perhaps have interpreted the evidence in the manner Union Carbide suggests, but the evidence also supports a different interpretation: that Union Carbide did not share its knowledge of the dangers of asbestos with its customers or with individuals who would, predictably, be exposed to dust from its products, and that it instead sought to downplay the risk.

Plaintiffs presented such evidence through the introduction of numerous memoranda, letters, and reports authored by and distributed to Union Carbide engineers, medical staff, and other executives (and in some instances sent to customers), and through the testimony of former Union Carbide employee J.L. Myers, who joined Union Carbide in 1966 as part of the asbestos research and development group, who was appointed to the position of marketing manager for asbestos products in 1970, and who in 1981 was promoted to product and production manager.

For instance, there was evidence that at some points, the warning Union Carbide gave its customers was weaker than the warnings given to employees at its mine and its mill. In 1964, Union Carbide prepared a toxicology report on the danger of asbestos and by 1968 had prepared a brochure specifically for the drywall industry. These were given to customers, but not to union halls, and Union Carbide made no effort to deliver the report, brochure, or other information to workers.

In October 1971, well after Union Carbide had internally decided that "it would be prudent to assume that Calidria Asbestos will behave like other asbestos," vis-à-vis mesothelioma and other health risks, it intimated in letters to customers that Calidria was or might be different than other asbestos in that respect.

The president of Hamilton Materials testified that after he and other Union Carbide customers became concerned about the dangers of asbestos, and contractors began asking questions, a drywallers' association sought information about those dangers from Union Carbide, and was told that "it was no big deal." On another occasion, when Hamilton asked Union Carbide about the dangers of asbestos, the Union Carbide representative said that "it was going to blow over. It was no big deal." As Union Carbide argues, there is no evidence on when this was said, but the testimony is nonetheless relevant to punitive damages.

In June of 1972, a Union Carbide manager, B.L. Ingalls, wrote a memo to other members of Union Carbide's marketing department, suggesting a "basic format for handling inquiries from customers concerning the new OSHA regulations." Far from suggesting a full and frank discussion of the danger of asbestos, Ingalls wrote that "Controlling the conversation is paramount." He suggested ways to "soothe" the customer, then wrote "If the customer is persistent and threatens to eliminate asbestos—a certain amount of aggressiveness may be effective. Words and catch phrases such as 'premature,' 'irrational' or 'avoiding the inevitable' will sometimes turn the table. [¶] The main objective is to keep the customer on the defensive, make him justify <u>his</u> position. Most customers who call are on the offensive, often prepared with 'loaded' questions and expecting an argument. Change the mood before discussing anything pertinent about the new regulations. Alternating between an aggressive and submissive attitude is confusing and allows you to bide your time. Refuse to argue, be humble and when they are sufficiently calm, sometimes even embarrassed, make your point forcefully. Don't cover too much ground in one confrontation. Even rabies shots are spaced at moderate intervals."

### 2. *Evidentiary errors*

Union Carbide contends that erroneous rulings on evidence compel reversal of the punitive damages award.

First, Union Carbide contends that the court prejudicially erred by barring it from asking Myers if he believed that it was safe for him and others to work at Union Carbide asbestos processing plants. The request was made at a sidebar during plaintiffs' questioning of Myers. The sidebar was occasioned

by a Union Carbide objection that plaintiffs were about to violate a ruling on a motion in limine excluding evidence about worker health at Union Carbide's King City asbestos facility, in particular, the death of an employee. During the sidebar, Union Carbide asked the court for guidance, saying "I want to tell you a question I would like to ask Mr. Myers . . . . Obviously, in terms of Mr. Myers' state of mind, the fact that he allowed himself to work around that asbestos, I think, is relevant to his state of mind, and I'm not going to ask him about his health." Union Carbide argued that the evidence was relevant to fraud and punitive damages, and plaintiffs raised, inter alia, an objection under Evidence Code section 352. The court said, "His state of mind is irrelevant," later noting that the fraud at issue involved concealment of the dangers of asbestos from Hamilton and others. The court also ruled that it would stand by its ruling on the motion in limine.

We can see no abuse of discretion in the trial court ruling, and no prejudice. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900 [122 Cal.Rptr.2d 802]; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281 [88 Cal.Rptr.3d 186].) The state of mind of any particular Union Carbide employee, vis-à-vis his or her own risk, was not the issue. Any given employee might be particularly careful or careless, confident or worried, about his or her own health. Myers was a long-term and senior Union Carbide employee, who still consulted for Union Carbide. If, as Union Carbide asserts, he testified that he worked around asbestos, the jury could easily have deduced that he did so voluntarily, with no ill effect or fear of ill effect. His testimony to that effect could have added little.

We next turn to exhibit 10604, which Union Carbide contends was erroneously and prejudicially introduced into evidence. This exhibit consisted of a three-page letter from J.L. Myers of Union Carbide to a Thomas Anderson of Dow Chemical, and a one-page Dow Chemical memo, which was attached to the letter. The letter is dated April 29, 1975. In the most relevant part, it discusses the Dow Chemical memo. The Dow Chemical memo states, inter alia, that "Union Carbide claims that they have sufficient toxicological data that places Calidria in the nuisance dust category and distinctly separates it from emotional generalizations associated with generic asbestos." In the letter, Myers states that Dow Chemical has misconstrued a paper he had given earlier and that "Union Carbide has not made such a statement and in fact is in disagreement with it." The exhibit, in its entirety, was produced by Union Carbide in discovery and was admitted over Union Carbide's objection.

Myers was examined on this letter by plaintiffs, and in closing, plaintiffs' counsel argued that the exhibit showed that Union Carbide was able to mislead "a very smart group of engineers at Dow Chemical" about the

dangers of Calidria asbestos. Counsel's argument also referenced the part of the exhibit that disavowed Dow Chemical's interpretation of Union Carbide's claims.

Union Carbide argues that the jury thus heard hearsay evidence that Union Carbide had stated that its asbestos was "nuisance dust." As we see it, the jury had before it an admissible business record, found in Union Carbide's files, which indicated that Dow believed that Union Carbide had so stated, but that Union Carbide believed that Dow was wrong. The exhibit was thus a mixed blessing for plaintiffs. We see no abuse of discretion in its admission, in full, and no possibility of prejudice even if there had been error.

Finally, Union Carbide complains that the court gave an erroneous limiting instruction on an exhibit, the 1972 OSHA standards on asbestos. In that instruction, the court told the jury that the document "is being offered basically to show what information or what warnings may or may not have been given by Union Carbide to anyone else, for that purpose, for that limited purpose, but you mustn't follow whatever rules are in this document as the law that applies to this case . . ." and that "information on government standards has only been allowed for the limited purpose of notice or as to what information was available to defendant Union Carbide Corporation and others. Compliance with government standards or regulations does not preclude the potential imposition of liability for a defective product or negligence."

Union Carbide argues that OSHA regulations were "the law," and that it could reasonably expect those governed by the law, like drywall contractors, to follow the regulation, thus showing that it did not act with knowing disregard for worker safety.

First, while it is true that in some senses OSHA regulations are law, the court's instruction was correct. It told the jury that the regulations did not govern this case, in which the issues concerned defect and warning, not compliance with any given regulation. Further, Union Carbide was permitted to make the argument it now claims was barred. It argued that "as the judge just told you . . . the OSHA regulations can be considered here as the knowledge available on the hazards and safe use of asbestos. And what you can consider the regulations for are on the issues of what the ordinary consumer of Union Carbide Calidria could expect about the hazards of asbestos and how to safely work with it and around it and what our customers to whom we gave those regulations knew or should have known as a result of having them. And it also goes to the issue of whether Union Carbide failed to provide adequate warnings to its customers where we were actually giving them these regulations that talked about the hazards and how it can be safely used."

### 3. *Federal due process standards*

Union Carbide argues that the punitive damages award violates its federal due process rights. It makes arguments under two of the three "guideposts for courts reviewing punitive damages"; the degree of reprehensibility of the defendant's misconduct and the relationship between the harm suffered by the plaintiff and the award. (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712–713 [101 Cal.Rptr.3d 773, 219 P.3d 749].)

Union Carbide first argues that the punitive damages award here was too high, given that its conduct was at the low end of the reprehensibility scale, where, it argues, punitive damages cannot exceed compensatory damages. In factual support, it references its argument on the sufficiency of the evidence for punitive damages. That is, it argues that it did nothing wrong. Though the United States Supreme Court has "suggested that a ratio of one to one might be the federal constitutional maximum in a case involving . . . relatively low reprehensibility and a substantial award of noneconomic damages" (*Roby v. McKesson Corp., supra,* 47 Cal.4th at p. 718), this is not such a case.

Union Carbide's argument is simply insufficient. Plaintiffs' case was that Union Carbide profited from the sale of a dangerous substance, that it knew the dangers of its product, that it failed to warn consumers of those dangers, and Larry Stewart developed a fatal cancer as a result. Union Carbide's mere assertion to the contrary cannot change the result.

Nor do we agree with Union Carbide that the award was too high when measured against the compensatory damages. Here, Union Carbide argues that the award does not bear a reasonable relation to its actual contribution to plaintiffs' injuries. As to "actual contribution," it asks us to look not at the 85 percent contribution, which the jury found, but to the preverdict settlements. It cites no authority for this proposition, and we know of none.

Union Carbide received credit for the preverdict settlements. It does not contend that the court erred in its methods of calculating those credits, but does contend that the fact that plaintiffs received other money means that its share of fault is actually less than 85 percent, and that the punitive award should not be compared to the compensatory award, but to a lesser number. We cannot see that the settlements reflect the fault of the other defendants, since settlement may be based on many factors, in addition to or even aside from fault. The settlements reduced the amounts Union Carbide had to pay, but we cannot see that the fortuity of those settlements also governs the review of the punitive damages award.

## Disposition

The judgment is affirmed. Respondents to recover costs on appeal.

Turner, P. J., and Mosk, J., concurred.

A petition for a rehearing was denied December 8, 2010, and appellant's petition for review by the Supreme Court was denied March 2, 2011, S189287.