Filed 7/24/13  Keeney v. A.W. Chesterton CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| RICHARD KEENEY et al., | B240313 |
| Plaintiffs and Cross-Appellants, | (Los Angeles County Super. Ct. No. BC457255) |
| v. | |
| A.W. CHESTERTON COMPANY et al., | |
| Defendants and Cross-Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy D. Hogue, Judge.  Affirmed.

Farrise Firm and Simona A. Farrise; The Arkin Law Firm and Sharon J. Arkin for Plaintiffs and Cross-Appellants.

Hawkins Parnell Thackston & Young, Robert E. Thackston and Julia A. Gowin for Defendant and Cross-Respondent John Crane Inc.

Richard Keeney developed mesothelioma, a disease caused by exposure to asbestos. He and Howard J. Garcia[1] filed suit against numerous defendants, seeking compensatory and punitive damages for Keeney's exposure to asbestos during his 20 years of service in the United States Navy and his 16-year employment by C & H Sugar Company (C & H). A jury trial was held against John Crane Inc., the only remaining defendant after the others either settled or were dismissed. The jury allocated the majority of the liability to the Navy but found that John Crane was 12 percent liable for Keeney's damages. John Crane filed this appeal, and appellants filed a cross-appeal. However, John Crane paid the judgment and subsequently abandoned its appeal. Appellants contend in their cross-appeal that the evidence is not sufficient to sustain the jury's allocation of liability and that John Crane should be held liable for 100 percent of the damages. We disagree and find that there is substantial evidence to support the jury's findings. Appellants also contend that the trial court abused its discretion in allowing a former Navy commander to testify because it violated a Navy regulation. We disagree, and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellants' theory at trial was that Keeney developed mesothelioma from his exposure to asbestos during his 20 years in the Navy and to gaskets and packing material manufactured by John Crane, some of which contained asbestos, during Keeney's 16 years of employment by C & H. We summarize the evidence under the familiar standard of appellate review, viewing the entire record in the light most favorable to the judgment.

---

[1]     Although Keeney and Garcia are cross-appellants, for ease of reference we will refer to them as appellants in this opinion.

*Keeney's Navy Service*

Excerpts of Keeney's deposition were read at trial and he also gave live testimony. Keeney served in the Navy from 1958 to 1979. He served aboard the USS Enterprise from 1966-1967 and 1971-1972, the USS Coral Sea from March to November of 1970, and the USS Nimitz from 1972-1976. Keeney also served as the ship safety superintendent at the Mare Island Naval Shipyard from 1976-1979, overseeing overhauls of several submarines.

According to Keeney, he received no training in the Navy about safe handling of asbestos. However, in 1977 Keeney was certified as a ship safety superintendent. He admitted that he received some health hazard information regarding asbestos in connection with the certification, but he was not examined on it.

Keeney testified that pipes on Naval ships were covered with insulation that crumbled easily when bumped, creating asbestos dust in the air. In the late 1960's and 1970's, he worked near areas where maintenance was performed on insulation, and "you could see a certain amount of dust in the air." Keeney also saw insulation installed and removed, including a pipe covering that Naval personnel referred to as "asbestos." Keeney had cut that type of insulation himself and was present when such old insulation aboard ships was ripped out.

Barry Castleman, a Ph.D. in occupational and environmental health policy, testified for appellants. He stated that, by the 1930's, there was abundant medical and scientific literature about workers who died of asbestosis. Mesothelioma was first associated with asbestos in 1943. Dr. Castleman testified that a 1938 United States public health study of asbestosis and its risks published by the federal government was made widely available. It would have been available to the Navy.

3

With respect to Keeney's exposure to asbestos in the Navy, John Crane called Commander James Delaney. He explained that he was not speaking on behalf of the Navy and therefore did not require authorization from the Navy to testify. Instead, his testimony was based solely on his own experience.

Commander Delany testified that he had served on the USS Enterprise for about a year with Keeney. They both served as senior supervisory watches in nuclear power plants and machinist mates, and they worked in some of the same areas. Commander Delaney testified that during the years he and Keeney served on the USS Enterprise, the insulation surrounding steam pipes on the ship contained asbestos. In 1971, he and Keeney removed much of the ship's insulation to repair the pipes, and no precautions were taken to contain the asbestos material.

Commander Delaney testified that he received safety training regarding asbestos hazards in the early 1970's and that Keeney would have received the same type of training. Also, when the Navy was refurbishing submarines at Mare Island Shipyard in the 1970's, insulation containing asbestos was removed. He believed that asbestos abatement procedures would have been in place and that someone in Keeney's position of ship safety supervisor would have been aware of those procedures.

John Crane also introduced into evidence a June 2011 letter to the Department of Veterans Affairs from Keeney, in which Keeney asked that his disability status be changed to 100 percent. Keeney wrote that he had recently been diagnosed with mesothelioma, caused by exposure to asbestos, and he stated that there was a high incidence of mesothelioma among sailors with a similar naval background to his. He explained that he performed engine room maintenance, served as ship superintendent at Mare Island Naval Shipyard, and had "[m]ajor exposures to insulation dusts and products containing asbestos." He also described

an incident aboard the USS Ranger, in which the ship "blew a boiler," causing insulation to "rain[]" down on them for 30 minutes, which he helped clean up with no breathing protection.

*Keeney's Employment at C & H*

After leaving the Navy, Keeney worked for C & H from 1979 to 1994. His first job at C & H was as a pump mechanic, which brought him into contact with packing and gasket materials, some of which were manufactured by John Crane. Keeney estimated at trial that approximately half of the packing material he worked with at C & H was manufactured by John Crane and that he used the material once or twice a week. He testified that his work with John Crane gaskets created dust because he needed to cut and hammer materials. He was not instructed to use water so that dust would not be created. He recalled seeing the word "asbestos" on the products and in pamphlet information, although he was not warned that these products could cause cancer.

Mark Thompson, an employee at C & H since 1976, and Richard Amick, an employee since 1980, testified for John Crane. Thompson had worked as a maintenance mechanic for about 10 years and knew Keeney. As a mechanic, Thompson sometimes worked on pipes and pumps and may have worked on the same pumps that Keeney worked on. Thompson also worked with gaskets, although he did not recall seeing any gaskets or packing materials manufactured by John Crane.

Amick worked with Keeney as a journeyman mechanic and occasionally worked in the pump shop, doing the same work as Keeney. Amick did not recall seeing any John Crane gaskets at C & H. He stated that C & H did not use much John Crane packing material and primarily used other brands. Both Amick and

5

Thompson stated that the only John Crane products commonly used at C & H were mechanical seals.

According to Thompson and Amick, from their first day of work C & H warned about the presence of asbestos and sometimes discussed it at safety meetings. Thompson and Amick stated that they received warnings every January about areas in the refinery where asbestos was located. Although Thompson and Keeney attended different safety meetings because they worked in different areas, Thompson testified that everyone should have received the same information about asbestos.

Dr. Castleman testified that the federal Occupational Safety and Health Administration (OSHA) was created in 1970 and first published regulations on asbestos in 1971. By 1979, information regarding the need to take safety precautions around asbestos products was available to employers.

John Henshaw, the head of OSHA from 2001 to 2004, testified that by 1972 OSHA had established standards regarding asbestos exposure. Henshaw stated that employers had the responsibility to protect and train employees by, for example, controlling dust when using power tools by using "local exhaust" and "wet methods."

*Other Expert Testimony*

John Crane called Amy Madl, a Ph.D. in pharmacology and toxicology. She testified that Keeney's work with asbestos-containing gaskets and packing materials at the C & H refinery did not increase his risk of mesothelioma. Dr. Madl explained that there are essentially two types of asbestos fibers – serpentine, which are curly shaped, and amphiboles, which are straight and spear like and therefore are deposited in the lungs more easily. Amosite, a type of amphibole,

6

was the predominant fiber type used in insulation in naval and commercial industrial operations.

Insulation is a friable product, meaning that it breaks apart and releases dust or fibers with hand pressure. Dr. Madl testified that John Crane's gaskets and packing were encapsulated products, which meant that the asbestos fibers were bound or coated in a binding agent or resin so that they were not friable. Dr. Madl therefore concluded that gaskets and packing produced very low concentrations of airborne asbestos and thus would not cause mesothelioma, a conclusion that she testified was consistent with other scientists' opinions.

Appellants' expert witness, Dr. Barry Horn, a pulmonologist, testified that all types of asbestos fibers caused mesothelioma, and that even an exposure of short duration could cause the disease. He testified that he had seen a number of people develop mesothelioma after working in shipyards, including the Mare Island Navy Shipyard.

Dr. Horn testified that asbestos-containing gaskets and packing released asbestos fibers when they were scraped or used. He opined that Keeney's exposure to asbestos in the Navy and at C & H would have contributed to his risk of developing mesothelioma. Dr. Horn further testified that Keeney's risk of developing mesothelioma was based on "all of the asbestos exposure he had over his career."

*Procedural Background*

Appellants filed suit against numerous defendants, including 400 Doe defendants. They asserted causes of action against what they called "product defendants" for negligence, breach of implied warranty, strict products liability, false representation, fraud/intentional misrepresentation (this cause of action was

7

not asserted against John Crane), and failure to warn.[2] After the other defendants settled or were dismissed, a jury trial against John Crane was held. In an amended verdict, the jury allocated 5 percent liability to Keeney, 12 percent to John Crane, 13 percent to C & H, and 70 percent to the Navy.[3] The jury rejected appellants' design defect cause of action. The jury found in favor of appellants on their failure to warn cause of action and found this to be a substantial factor in causing Keeney's harm. The jury also found John Crane to be negligent and found its negligence to be a substantial factor in causing Keeney's harm. In addition, the jury found that C & H, the Navy, and Keeney were negligent and that their negligence was a substantial factor in causing Keeney's harm. The court entered an amended judgment, reflecting offsets for prior settlements, and ordered John Crane to pay $554,544.14 in economic damages and $540,999.96 in noneconomic damages to Keeney and $38,580 to Garcia.

John Crane appealed, and appellants cross-appealed. On April 27, 2012, John Crane sent a check to appellants' counsel reflecting full payment of the $1,134,124.10 amended judgment, plus $110,345.78 in costs, plus $31,026.45 in post-judgment interest, for a total of $1,275,497.33. Appellants cashed the check. John Crane subsequently abandoned its appeal.

---

[2]     The complaint also asserted loss of consortium and two causes of action against "equipment defendants."

[3]     There were inconsistencies on the jury's initial verdict form, such as apportioning liability to C & H and the Navy without finding them negligent. The court therefore issued further instructions, and the jury amended its verdict but did not change its apportionment of liability or the amount of damages.

## DISCUSSION

I.    *Dismissal of the Instant Appeal*

As an initial matter, John Crane argues that the appellants' appeal should be dismissed because appellants accepted the benefits of the underlying judgment by cashing the check John Crane sent in satisfaction of the judgment.  Bearing in mind the general policy favoring hearings on the merits (*Lee v. Brown* (1976) 18 Cal.3d 110, 113), we find applicable an exception to the general rule cited by John Crane and therefore decline to dismiss the appeal.

""'"It is the settled rule that the voluntary acceptance of the benefit of a judgment or order is a bar to the prosecution of an appeal therefrom.  [Citations.]" [Citation.]  The rule is based on the principle that "the right to accept the fruits of the judgment and the right to appeal therefrom are wholly inconsistent, and an election to take one is a renunciation of the other.  [Citation.]" [Citation.]' [Citation.]  . . .  'Although the acceptance must be clear, unmistakable, and unconditional [citation], acceptance of even a part of the benefit of a judgment or order will ordinarily preclude an appeal from the portion remaining.  [Citation.]' [Citation.]" (*Satchmed Plaza Owners Assn. v. UWMC Hospital Corp.* (2008) 167 Cal.App.4th 1034, 1041-1042.)

"There is an exception, however, to the general rule that '"the voluntary acceptance of the benefit of a judgment or order is a bar to the prosecution of an appeal therefrom . . ." . . . where the appellant's right to the accepted portion of the judgment is not disputed on appeal.' [Citation.]  . . .  '[T]he appeal as to the disputed portion may proceed, because a reversal will have no effect on the appellant's right to the benefit he . . . has accepted.' [Citation.]" (*Steinman v. Malamed* (2010) 185 Cal.App.4th 1550, 1555.)

Thus, for example, "'where the judgment clearly establishes the appellant's right to recover but the amount is less than he demands, he may accept it and nevertheless appeal, claiming the larger recovery. [Citations.]' [Citation.]" (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 744.) There is no dispute here that appellants were entitled to the amount representing 12 percent of the damages awarded by the jury. Appellants' contention on appeal is that John Crane should be liable for the entire amount. We therefore decline to dismiss the appeal.

II.     *Substantial Evidence to Support Apportionment of Fault*

Appellants contend that the allocation of liability must be vacated and John Crane ordered to pay 100 percent of the award because John Crane failed to present evidence sufficient for the jury to apportion liability to other parties or entities. At the outset, we note that appellants' opening brief fails to summarize all the relevant evidence, and instead discusses only the evidence favorable to their contention. They have therefore forfeited their challenge to the sufficiency of the evidence. "[A]s with any challenge to the sufficiency of the evidence, it is the appellant's burden to set forth not just the facts in its favor, but all material evidence on the point. '"Unless this is done the error is deemed to be waived."' [Citation.]" (*Stewart*, *supra*, 190 Cal.App.4th at p. 34; see also *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218 ["A party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable. [Citation.]".)

In the alternative, we conclude that there is substantial evidence to support the jury's allocation of fault. A jury's apportionment of fault is reviewed for substantial evidence. (*Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th

10

1225, 1234 (*Rosh*).) We may not substitute our judgment for that of the jury or set aside the jury's finding "'if there is any evidence which under any reasonable view supports the jury's apportionment. [Citation.]'" (*Ibid.*) "In our analysis, we start with the presumption that the record contains evidence sufficient to support the judgment. It is the appellant's affirmative burden to demonstrate otherwise. [Citation.]" (*Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 33 (*Stewart*).)

It is undisputed that Keeney served in the Navy for over 20 years. He told his doctor that he was exposed to asbestos during those 20 years, and he testified that, in the 1960's and 1970's, he worked near areas where asbestos dust accumulated and personally handled asbestos-containing insulation. In his letter to the Department of Veterans Affairs, Keeney stated that there was a high incidence of mesothelioma among sailors with his naval background and explained that the work he did for the Navy involved "major" exposure to dust and products containing asbestos. Keeney also recounted a specific incident in which he was ordered to help clean up insulation with no breathing protection. Thus, there was ample evidence for the jury to attribute the lion's share of liability – 70 percent – to the Navy.

As to Keeney's own negligence in the Navy, Commander Delaney served in the same positions in the Navy as Keeney and served on the same ship for about a year. He testified that Keeney would have received the same safety training regarding asbestos that he received. Commander Delaney believed that there were asbestos abatement procedures in place and that Keeney, as a ship safety supervisor, should have been aware of those procedures. In addition, Keeney testified that he reviewed documents containing health hazard information regarding asbestos in preparing for his certification as a ship safety superintendent.

11

Concerning Keeney's exposure at C & H and his comparative fault, there is no dispute that Keeney came into contact with packing materials and gaskets that contained asbestos during the 16 years he worked at C & H. Although Keeney testified that he received no safety training regarding asbestos at C & H, his testimony was contradicted by Thompson and Amick, who testified that they received information from C & H about asbestos and that it was regularly discussed at safety meetings.

There was also evidence tending to prove the unlikelihood that John Crane's products caused significant exposure at C & H. In his work at C & H, Thompson did not recall seeing any gaskets or packing material manufactured by John Crane. Amick recalled working with no John Crane gaskets, and stated that C & H did not use much John Crane packing material. Also, Madl testified, in substance, that John Crane's gaskets and packing were encapsulated and would result in very low concentrations of airborne asbestos.

From this evidence, the jury could rationally determine that the Navy was 70 percent responsible for Keeney's exposure to asbestos, John Crane was 12 percent responsible, C & H 13 percent, and Keeney 5 percent. It was not incumbent on John Crane to produce evidence – expert or otherwise – quantifying precise percentages of liability. "[T]he jury's power to apportion fault is as broad as its duty to resolve conflicts in the evidence and assess credibility. . . . 'Furthermore, the appellate court may not substitute its judgment for that of the jury or set aside the jury's finding if there is any evidence which under any reasonable view supports the jury's apportionment. [Citation.]' [Citation.]" (*Rosh, supra,* 26 Cal.App.4th at p. 1234.) We conclude that appellants have failed to meet their burden to demonstrate that the record does not contain sufficient evidence to

12

support the jury's allocation of liability. (*Stewart*, *supra*, 190 Cal.App.4th at p. 33.)

Appellants rely on *Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461 (*Sparks*) and *Stewart* to argue that John Crane did not bear its burden of providing evidence to support the jury's allocation of liability. *Sparks* and *Stewart* are distinguishable.

In *Sparks*, the jury found that an asbestos-containing insulation produced by the defendant was defective and that the defect was the sole legal cause of injury to the plaintiff. As pertinent here, the defendant argued on appeal that substantial evidence did not support the jury's allocation of 100 percent of the fault to the defendant. The appellate court stated that it was a close question but concluded that there was sufficient evidence to support the jury's finding, reasoning that there were several ways the jury could have concluded the defendant's product was the sole legal cause of the plaintiff's injuries, despite evidence that the plaintiff was exposed to other asbestos-containing products. (*Sparks*, *supra*, 32 Cal.App.4th at p. 477.)

The *Sparks* court recounted the evidence presented by the defendant that other products were concurrent causes of the injury but noted that the defendant "did not carry its burden and, apparently, the jury was not convinced." (32 Cal.App.4th at p. 478.) The court reasoned that the defendant did not offer evidence about the specific properties of the other products to which the plaintiff was exposed and did not develop the details of his exposure. (*Ibid.*)

In *Stewart*, the jury allocated 85 percent of the fault for the plaintiff's mesothelioma to Union Carbide, which argued on appeal that the allocation was not supported by substantial evidence. As in *Sparks*, the appellate court reasoned that the jury simply found that Union Carbide did not carry its burden of

establishing concurrent or alternate causes and that the jury "was entitled to so find." (*Stewart*, *supra*, 190 Cal.App.4th at p. 33.)

Here, unlike *Sparks* and *Stewart*, John Crane produced substantial evidence of concurrent causes for Keeney's mesothelioma: his exposure to asbestos in the Navy, and Keeney's own negligence in handling asbestos both in the Navy and at C & H. John Crane also produced evidence tending to show the unlikelihood that its products exposed Keeney to asbestos while he was at C & H.

Appellants also contend that John Crane bore the burden of proving that Keeney or others acted unreasonably, citing *Wilson v. Ritto* (2003) 105 Cal.App.4th 361 (*Wilson*). *Wilson* holds that a defendant who seeks to add a joint tortfeasor to a special verdict form must provide evidence that the nonparty tortfeasor was also at fault for the plaintiff's injuries. (*Id.* at pp. 367-369.) The question there was whether the trial court erred in denying the defendant's motion to add another doctor to the special verdict form as an additional tortfeasor against whom the jury could assess a percentage of fault. (*Id.* at p. 366.) Because the defendant failed to proffer sufficient evidence that the other doctor committed medical malpractice, the court affirmed the denial of the motion to add the other doctor to the special verdict form as a joint tortfeasor. (*Id.* at p. 370.)

In their opening brief, appellants seem to rely on *Wilson* to argue that John Crane bore a higher burden of proof than it met. To the extent that appellants argue that a higher standard of proof should have been required in order to support the jury's apportionment of liability to the Navy, C & H, and Keeney, we agree with John Crane that appellants' argument is foreclosed by the jury instructions given here.[4]

---

[4] In their reply brief, appellants concede the correctness of the jury instructions and argue only that there is not substantial evidence to support the allocation.

14

""""""In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion." [Citations.]' [Citation.] Neither a trial court nor a reviewing court in a civil action is obligated to seek out theories plaintiff might have advanced, or to articulate for him that which he has left unspoken." [Citation.]'" (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1008.) Thus, "where a party to a civil lawsuit claims a jury verdict is not supported by the evidence, but asserts no error in the jury instructions, the adequacy of the evidence must be measured against the instructions given the jury." (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535.) To do otherwise "would allow a party to withhold a theory from the jury, by failing to request instructions, and then to obtain appellate review of the evidence and reversal of the judgment on a theory never tendered (or tendered in a different form) to the jury." (*Ibid.*)

The trial court instructed the jury as follows regarding negligence: "Negligence is the failure to use reasonable care to prevent harm to one's self or to others. A person can be negligent by acting or failing to act. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation. You must decide how a reasonably careful person would have acted in defendant's situation."

Because John Crane claimed Keeney's own negligence contributed to his harm, the court also instructed the jury with CACI No. 405 regarding comparative fault. The instruction stated: "[John Crane] claims that [Keeney's] own negligence contributed to his harm. To succeed on this claim, [John Crane] must

15

prove both of the following:  [¶]  1.  That [Keeney] was negligent; and  [¶]  2.  That [Keeney's] negligence was a substantial factor in causing his harm.  [¶]  If [John Crane] proves the above, [Keeney's] damages are reduced by your determination of the percentage of [Keeney's] responsibility.  I will calculate the actual reduction."

The jury also was instructed with CACI No. 406 regarding the apportionment of responsibility.  The instruction stated:  "[John Crane] claims that the fault of other manufacturers, suppliers or contractor-users of asbestos products also contributed to [Keeney's] harm.  To succeed on this claim, [John Crane] must prove both of the following:  [¶]  1.  That other manufacturers, suppliers or contractor-users of asbestos products were at fault; and  [¶]  2.  That the fault of other manufacturers, suppliers or contractor-users of asbestos products was a substantial factor in causing [Keeney's]  harm.  [¶]  If you find that the fault of more than one person including [John Crane] and [Keeney] and other manufacturers, suppliers or contractor-users of asbestos products were [*sic*] a substantial factor in causing [Keeney's] harm, you must then decide how much responsibility each has by assigning percentages of responsibility to each person listed on the verdict form.  The percentages must total 100 percent.  [¶]  You will make a separate finding of [Keeney's] total damages, if any.  In determining an amount of damages, you should not consider any person's assigned percentage of responsibility.  [¶]  'Person' can mean an individual or a business entity."

The jury thus was instructed to apportion liability to an entity if it found the entity was at fault and that entity's fault was a substantial factor in causing Keeney's harm.  As discussed above, there is substantial evidence to support the jury's findings of fault and allocation of liability.  We therefore reject appellants'

16

argument that the evidence is insufficient to sustain the jury's allocation of liability.

III.     *Admission of Commander Delaney's Testimony*

Appellants contend that the trial court erred in allowing Commander Delaney to testify because his testimony violated Navy guidelines.  The trial court correctly ruled that appellants do not have standing to assert the Navy's privilege.

Appellants brought a motion in limine to exclude Commander Delaney's testimony, based in part on the contention that Commander Delaney was precluded from testifying by an instruction from the Secretary of the Navy, SECNAV Instruction No. 5820.8A, and 32 C.F.R. section 725.1.  The court explained that appellants did not have standing to raise a privilege held by the Navy.  In response to appellants' argument that Commander Delaney's testimony would violate a federal statute, the court replied that Commander Delaney "does it at his peril," but that was not a basis on which the court should exclude the testimony.

Appellants' reliance on SECNAV Instruction No. 5820.8A is unavailing because that instruction addresses the release of *official information* for litigation purposes and testimony by Navy personnel.[5]  As appellants themselves point out, the instruction precludes present or former Navy personnel from providing testimony regarding *official* Department of Defense information, subjects, personnel, or activities.  Commander Delaney specifically stated that he was not testifying on the Navy's behalf but about his own experience in the Navy.

Even if Commander Delaney's testimony could be construed as official Department of Defense information such that the instruction applied, appellants do

---

[5]     Appellants also cite 32 C.F.R. section 725.1, but that regulation merely restates the information contained in Instruction No. 5820.8A.  (32 C.F.R. § 725.1.)

17

not have standing to assert the Navy's interest. "Privileges are *personal* in nature. Therefore, the right to claim *or waive* a privilege rests fundamentally with the '*holder*' (or holders, where a privilege is held jointly by two or more persons). [Citation.]" (Wegner et al., Cal. Practice Guide: Civil Trials & Evidence (The Rutter Group 2012) ¶ 8:1873, p. 8E-8; see also, e.g., 2 Witkin, Cal. Evidence (5th ed. 2012) Witnesses, § 59, p. 343 ["A privilege is personal to the holder; thus, it must be claimed and may be waived [citation]."]; *People v. Ford* (1988) 45 Cal.3d 431, 439 ["The privilege against self–incrimination is, of course, personal and may be asserted only by the holder."]; *People v. McWhorter* (2009) 47 Cal.4th 318, 374 [stating that the spousal privilege is personal to the spouse seeking to avoid testifying, so the defendant, who was not the holder of the privilege, did not have standing to assert it].) The Navy has not challenged Commander Delaney's testimony and appellants have no standing to assert an objection on the Navy's behalf.

Appellants also assert that Commander Delaney's testimony was precluded by Evidence Code section 1040, which sets forth the privilege of a public entity to refuse to disclose official information. Official information is defined as "information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made." (Evid. Code, § 1040, subd. (a).) The privilege must be "claimed by a person authorized by the public entity to do so . . . ." (*Id.*, subd. (b).)

There is no indication that Commander Delaney's testimony concerned information acquired in confidence. More importantly, appellants are not persons authorized by the Navy to assert any official privilege. Evidence Code section 1040 does not apply.

18

## DISPOSITION

The judgment is affirmed.  Cross-Respondent John Crane is entitled to costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


SUZUKAWA, J.


19