Filed 1/8/16  In re Jason B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JASON B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D068280 |
| Plaintiff and Respondent, | (Super. Ct. No. EJ03882A-C) |
| v. | |
| DEANNA J., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Daniel G. Lamborn, Judge.  Affirmed.

Law Offices of Arthur J. LaCilento and Arthur J. LaCilento, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Emily K. Harlan, Deputy County Counsel, for Plaintiff and Respondent.

Jason B., Dustin B., and A.J. were removed from parental custody on the grounds that the family was living in squalor and that prescription drugs were accessible to the children even though several months earlier, A.J. was taken to the emergency room after ingesting morphine from the prescription of their mother, Deanna J. Deanna appeals the juvenile court's jurisdiction and disposition orders, primarily on the ground that they are not supported by substantial evidence. However, Deanna has forfeited appellate review by failing to discuss and analyze the evidence supporting the orders and instead, "present[ing] only facts and inferences favorable to . . . her position." (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.) In any event, we have independently reviewed the record and conclude that all issues raised on appeal lack substantive merit. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

Jason and Dustin were born in 2008 and 2007, respectively, and Joseph B. is their presumed father. A.J. was born in 2012, and Sheldon B. is her presumed father.

Deanna has a lengthy history with the San Diego County Health and Human Services Agency (Agency). Between 2007 and 2014, the Agency received 13 referrals, eight of which it investigated.

In August 2007, Deanna took Dustin to Rady Children's Hospital and alleged that Joseph shook him and caused an indentation in his head. No evidence of abuse was found. Rather, the indentation was determined to be "a pressure point caused by the baby preferring to sleep on that side." By the time a diagnosis was made, however, a family law case was opened, and Joseph was subjected to a three-year restraining order that

2

required him to complete anger management and parenting programs as a condition of unsupervised visitation.

In conjunction with Deanna's allegation, the Agency opened a voluntary services case. Joseph was cooperative, attended therapy, and completed the ordered programs. Deanna was uncooperative. She refused to sign a case plan, ignored the social worker's telephone calls and letters, and denied the Agency access to the boys. The Agency nonetheless closed the case as successful in 2008 after it assisted the family "with a housing search and some crisis management."

Because of all the court hearings that he was required to attend, Joseph lost his job. Because he could no longer pay for supervised visitation, it was canceled, and he could not afford to return to court to try to obtain unsupervised visitation. Joseph became discouraged, moved to Texas to be near his family, and lost contact with the boys. He mailed Deanna insurance information for them, but it was returned as undeliverable. She had moved without notifying him of her new address. His efforts to locate her through Facebook were unsuccessful.

In April 2013, the Agency opened another voluntary services case based on "concerns about the children stemming from [Deanna's] anxiety and depression." It was reported that Deanna "sleeps a lot during the day," and that the boys would answer the phone and say that she was asleep. Further, despite their ages, Jason and Dustin were not potty trained, and Jason arrived at school two or three times a week wearing the same "soaking wet" diaper from the night before. The school worked with Jason on potty training, but Deanna "would request that the school staff put [him] i[n] a pull-up diaper

3

prior to sending him home from school."  Additionally, "the home was . . . dirty, cluttered and smelt [*sic*] of urine," and Dustin slept in a chair because his bed was "full of clutter." The "house was infested with scabies and the family had noticeable scabies on their hands, arms, necks and face[s]."  Despite the conditions, the Agency closed the case because of Deanna and Sheldon's "resistance and refusal to participate in services."

In June 2014, A.J. ingested morphine prescribed for Deanna.  A report from Rady Children's Hospital states that A.J. was treated after "she was found with [a] 100mg morphine [tablet] in her mouth," and she "vomited pieces [of a pill] and the parents were unsure how many she took."  The hospital did not report the incident to the Agency.  A social worker visited the home after a referral several months later, and one of the boys told her about the incident.  The Agency requested the medical records, but it did not intervene.

This case began in February 2015 when the Agency was notified of "a possible hoarding environment."  The manager of the family's apartment reported "there is a 5-6 foot pile of stuff in the home, there is ho[a]rding, animals using the restroom in the home, and there is a strong odor of urine."  A cleaning company reported that the home had a "pungent urine stench," and estimated that it would cost $10,000 to "kill the horrendous odor" and put the home in a "livable condition."

Additionally, the boys' school reported that they typically smelled of urine and wore filthy and ill-fitting clothes.  The school potty trained Dustin, as it had done with Jason, because Deanna still put him in diapers.  The school was concerned that Deanna "continually dreams up medica[l] conditions [the boys] do not have."  Jason has autism,

4

but the school characterized both boys as "very bright." Jason, however, turned in homework only twice that school year, and both boys had been absent from school since January 22, 2015. Deanna failed to attend a meeting the school had scheduled to discuss the matter.

Two social workers went to the home and were allowed inside after approximately 15 minutes. They were met with "an overpowering heavy pungent odor of ammonia and urine." The home was "littered in garbage and debris," in some places "trash was stacked up to [four] feet high," and "it was difficult to walk [through] the home due to the conditions." Dogs were present and "the carpet was covered in urine and feces stains." Kitchen countertops "were covered . . . with dirty dishes and trash as well as cleaning supplies." A.J. was lying in a dirty crib oriented toward a television. Further, despite the previous incident with A.J., prescription drugs for Deanna and the maternal grandmother, who resided in the home, were accessible to the children.

Because Deanna and Sheldon refused to drug test or to work with the Agency in ensuring that medications were out of the children's reach, the Agency removed the children from parental custody. On February 11, 2015, the Agency filed petitions on behalf of the children based on the parents' failure or inability to protect them from physical harm or the risk thereof. (Welf. & Inst. Code, § 300, subd. (b)(1).)[1]

On February 17, 2015, Deanna was taken to the emergency room. She and Sheldon had been out drinking and were found "unresponsive" in a car. Deanna had a

---

[1] Further statutory references are to the Welfare and Institutions Code.

5

blood alcohol level of 0.166.  She admitted that "she abuses alcohol," but refused to say whether she used illicit drugs.  She reported "a history of seizure disorder, . . . , autism, anxiety, degenerative dis[c] disease, depression, fibromyalgia, hypothyroidism and mood disorder."  Sheldon had a blood alcohol level of between 0.128 and 0.135 and was arrested for driving under the influence.

The same day, firemen and police were called to the home because the grandmother had fallen out of her wheelchair.  They forcibly opened the door and entered after moving a dresser that was blocking the door.  According to a police report, "the scent of urine permeat[ed] throughout the house," "feces [were] all over," dishes were stacked approximately a foot high in the sink, "food [was] rotting in dishes with flies," and the refrigerator "was full with mostly rancid food."

The Agency filed amended petitions to add a second count, which alleged the February 17 alcohol incident and a February 13 test for Sheldon that was positive for marijuana.  The Agency suspected that both he and Deanna had substance abuse problems.

In its report for the jurisdiction and disposition hearing, the Agency recommended that Jason and Dustin be placed with Joseph.  Joseph was living with his wife and her three children in Texas, and was employed as a truck driver.  His wife was a stay-at-home mother with a business that she ran from home.  Joseph began speaking with the boys by phone, and he came to San Diego for a visit.  The boys were happy to see him and the visit went well.  Texas performed a courtesy evaluation of Joseph's home and found that it "was clean, appropriate and had no observable safety hazards."  (Italics omitted.)

6

A contested hearing began on the afternoon of April 17, 2015. Deanna's attorney sought a continuance because Deanna had a seizure and was taken from court to the emergency room. The court denied the request, but limited that day's evidence to the testimony of Jason and Dustin, which Deanna had already stipulated would be given in chambers without the parents' presence. The court specified that the boys were subject to recall if Deanna had questions for them after viewing their videotaped testimony.

Dustin testified that he would like to live with Deanna and Joseph together, if that were possible. During his visit with Joseph, he felt safe and had a good time. He would be sad to live with Joseph in Texas long term, however, because he would miss Deanna. He loves Deanna, has never been afraid of her, and would like more time with her.

Jason testified that he was not afraid of Deanna and wanted to live with her. He felt safe with Joseph, but Deanna took better care of him. Jason later admitted, however, that Deanna had told him how to testify because "[s]he wanted me to be back." When asked whether he wanted to go home with Deanna, he said he wanted "some more time with Joseph before I go home." When asked whether he wanted to visit Deanna, he said, "No, I just want to visit with my dad for a long time first."

Deanna appeared at the second day of the hearing, and her counsel advised the court that he had fully discussed the boys' testimony with her and did not intend to recall them. Deanna stated on the record that she agreed with that decision.

The current social worker, Karen Lowrimore, testified that Deanna had a lock box for her medications, but she repeatedly left them out. The family home had been recently cleaned up, but it still smelled strongly of urine. In Lowrimore's opinion, the recent

7

effort did not indicate that long-standing housekeeping issues were resolved. Further, she explained that Deanna had a lengthy history of neglecting the children in other respects.

For instance, on the day the children were taken into protective custody, Jason was sent to school in a diaper. Lowrimore testifed "it's very traumatic to be . . . a child that age still in a diaper. And I believe it shows neglect in . . . that the time was not taken to work with him." Further, Jason and Dustin were last seen by a doctor in 2013. There were concerns at that time that Jason had a sleep disorder, but there was no follow up. The San Diego Regional Center reported that Jason was entitled to services for autism, but he was not receiving them. A.J. had missed one or more doctor appointments, and as a result, she was behind in her inoculations. "[T]here were numerous concerns regarding her development condition and possible autism that were never addressed."

Further, the boys were approximately a year behind in school because of absenteeism and tardiness. Lowrimore testified that for two years, Deanna was subject to a SARB (Student Attendance Review Board) contract to ensure their attendance, but they still missed a lot of school. Deanna failed to pick up the boys numerous times from the bus stop after school, and they were returned to school. The police were called two or three times, and the boys were almost taken to Polinsky Children's Center.

Lowrimore testified that she had conducted a thorough investigation of Joseph. She spoke with him, his wife, and his wife's mother, had a social worker in Texas evaluate their home, and obtained a criminal history. She addressed all concerns that Deanna had raised about Joseph and determined that they were "either decades old or

unfounded."  Lowrimore believed that placement with Joseph would not be detrimental to the boys, and that there was no need for services for him or for further court supervision.

The court made true findings on the amended petitions.  The court placed Jason and Dustin with Joseph and terminated its jurisdiction over them, placed A.J. with a nonrelative extended family member and retained jurisdiction over her, and ordered reunification services for Deanna and Sheldon with respect to A.J.  On Deanna's assertion that she "cannot do urine tests," the court ordered her to drug test by other means. (Capitalization omitted.)

DISCUSSION

I

*Sufficiency of the Evidence*

A

*Forfeiture*

Deanna challenges the sufficiency of the evidence to support the court's exercise of jurisdiction over the children and the placement of Jason and Dustin with Joseph in Texas.  "On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings.  [Citations.]  The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value."  (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.)

The Agency contends that Deanna has waived appellate review by not fairly recounting the evidence supporting the court's orders.  "An appealed judgment is

9

presumed correct, and the appellant must affirmatively demonstrate error. [Citation.] An appellant challenging the sufficiency of the evidence to support the judgment must cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law. [Citations.] An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient. The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the judgment. An appellant . . . who cites and discusses only evidence in her favor fails to demonstrate any error and waives the contention that the evidence is insufficient to support the judgment." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.)[2]

The factual statement in Deanna's opening brief includes a few facts supporting the court's orders, but it elides the vast majority of them. Further, the discussion portion of the brief cites only the evidence that Deanna deems favorable to her. For example, she presents a distorted view of Joseph by focusing on his conduct more than 10 years ago rather than on the evidence of current lack of detriment. She asserts that Joseph "is an admitted sociopath," while neglecting to advise us that this assertion is based on a diary he kept when he was 19 years old, in which he wrote "that he thought he was a

---

2       Courts customarily use the term "waiver" in such circumstances (see, e.g., *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218; *Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 34), but the term "forfeiture" appears to be better suited. A "waiver" is an intentional relinquishment of a known right or privilege, whereas a " 'forfeiture results in the loss of a right regardless of the [appellant's] knowledge thereof and irrespective of whether [the appellant] intended to relinquish the right.' " (*King v. Superior Court* (2003) 107 Cal.App.4th 929, 938.)

sociopath."  Joseph testified that, at the time, he did not even know what the term "sociopath" meant.  Deanna had stolen his diary and used it against Joseph in family court.[3]  He denied having any mental illness.  The social worker had read the diary and was unconcerned.

We agree that Deanna's failure to cite the evidence supporting the court's orders constitutes a forfeiture of her challenge to the sufficiency of the evidence.  "[A]n attack on the evidence without a fair statement of the evidence is entitled to no consideration when it is apparent that a substantial amount of evidence was received on behalf of the respondent."  (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)[4]  However, we will consider the sufficiency of the evidence notwithstanding Deanna's failure to comply with the rule.  (*Liberty Mut. Ins. Co. v. Kleinman* (1957) 149 Cal.App.2d 404, 406.)

B

*Jurisdiction*

A dependency proceeding is essentially a bifurcated proceeding, in which the court must first determine whether the minor comes within any of the descriptions set

---

[3]     At the time of the hearing, Joseph was 30 years old.

[4]     Deanna has also forfeited appellate review by supporting her contentions with block citations to the record.  (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115.)  "It is the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations. . . .  As [a] practical matter, the appellate court is unable to adequately evaluate *which facts* the parties believe support their position when nothing more than a block page reference is offered in the briefs."  (*Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205; Cal. Rules of Court, rule 8.204(a)(1)(C) [appellate briefs must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"].)

forth in section 300 and is thus subject to its jurisdiction. (*In re Marquis H.* (2013) 212 Cal.App.4th 718, 724.) The petitions were filed under section 300, subdivision (b)(1), which applies when the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child."

Under the substantial evidence standard, " '[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.' " (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.) Substantial evidence is " 'evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact.' " (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)

"The appellate court does not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. [Citations.] The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) " 'We review a cold record and, unlike the trial court, have no opportunity to observe the appearance and demeanor of the witnesses.' " (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1427 (*Luke M.*).)

The evidence shows that when the Agency removed the children from parental custody, the family home was filthy and reeked of urine, and medicines were accessible

12

to the children. Lowrimore testified that the conditions presented a high risk to the children's physical safety. Although the home had been cleaned up before the hearing, Lowrimore believed that without court intervention, the condition would reoccur. She explained: " . . . It's been repeatedly brought to [the parents'] attention that the home needs to be cleaned," and "[t]hat the medicine needs to be put away. [¶] . . . [¶] And even when the kids were removed, it was ongoing. The parents didn't meet with me. I could not get in to see the house. [¶] Before they were even removed, [the Agency] tried to work with the parents to come to . . . meetings, to get drug tested. And this history has been going on for years."

Mark Esquivel, who works for a cleaning company, advised the Agency that he visited the home after it was reported to him that the family was in "distress" and "needed urgent help or they would be evicted," and "there were two . . . children in the home that were being bullied because they smelled of urine." Esquivel had experience with "hoarder homes," and he stated "that if he had to judge the home on a scale of 1-10, the home would be a 7-8[,] but due to having kids in the home it would be an 11." Debris was "piled four feet tall," the carpet had urine and feces stains, and the odor was "horrific."

The manager of the family's apartment building reported that cleaning up their apartment "has been an ongoing process for years." When management attempted to inspect the home, Deanna became "irate and aggressive." By the time of the hearing, the family had been served with an eviction notice.

13

Further, the home's condition was not the only problem. A few days after the children were removed, Deanna and Sheldon were found "unresponsive" in a parked car after a drinking bout. When a sheriff's deputy arrived, the car "spun off and [a] chas[e] ensued." When the car stopped, Deanna "stumbled out of the passenger side door and fell . . . to the ground." She was treated in the emergency room, where she admitted that she had an alcohol problem and refused to discuss any drug abuse. Her blood alcohol level was 0.166. Her doctor reported that "because of the strong prescriptions she takes, she should not be mixing them with alcohol."[5]

Contrary to Deanna's position, the issue of substance abuse was not resolved merely because she submitted to a single hair follicle test that proved negative. Deanna points to no evidence that she had even begun a substance abuse program. Section 300.2 provides: "[T]he provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child. Successful participation in a treatment program for substance abuse may be considered in evaluating the home environment."

---

[5] An Agency report notes that Deanna posted the following message on her Facebook page: "Oh, did I mention alcohol, and the ability to get stoned in the house? Only thing is cigs have to be smoked on the patio, but we have a large fully closed in patio . . . show up for a pool/bbq/drinking and 420 (marijuana) friendly fun at my old apartment, let me know." Deanna is apparently referring to Senate Bill No. 420 (2003-2004 Reg. Sess.), which enacted California's Medical Marijuana Program Act (Health & Saf. Code, § 11362.7 et seq.), which was intended to clarify and provide consistent application of the Compassionate Use Act (Prop. 215, § 1, as approved by voters, Gen. Elec. (Nov. 5, 1996); Health & Saf. Code, § 11362.5, et seq.).

Additionally, the evidence showed that the children's medical needs were not being met, Jason was not receiving services for his autism, the boys had issues with potty training and were sent to school in diapers at ages seven and eight, they were behind about a year in school because they were frequently absent or late, and they were frequently not picked up from the bus stop on time. Substantial evidence, indeed, overwhelming evidence, supports the court's jurisdictional orders.

C

*Disposition*

"After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing. [Citation.] At the dispositional hearing, the court must decide where the child will live while under the court's supervision." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.)

The court shall not remove a child from the custodial parent's home unless it finds clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child without removal. (§ 361, subd. (c)(1).) The same evidence that supports the court's exercise of jurisdiction supports the court's removal of the children from Deanna's custody.

When a child is removed from the custodial parent's home, "[s]ection 361.2, subdivision (a) evinces the legislative preference for placement with the noncustodial parent when safe for the child." (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262.) The statute provides that if the noncustodial parent requests custody, "the court shall

15

place the child with the parent [when] it finds that placement with that parent *would [not] be detrimental* to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a), italics added.)  A "nonoffending parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so," absent clear and convincing evidence of detriment.  (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 697.)

"In making a finding of detriment, the court may consider any jurisdictional findings that may relate to the noncustodial parent . . . , as well as any other evidence showing there would be a protective risk to the child if placed with that parent." (*In re V.F.* (2007) 157 Cal.App.4th 962, 970.)  "Section 361.2, subdivision (a) does not mandate placement with the noncustodial parent absent judicial examination of the circumstances of the parent and child."  (*In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1506.)

Deanna contends that the court erred by not finding detriment.  She claims that she established detriment by showing that Joseph "did not comply with [the] previous [d]omestic [v]iolence court orders form [*sic*] the family court"; "admitted to using illegal drugs such as [m]ethamphetamine and [m]arijuana on a regular basis as often as five times per week"; "has a criminal history, unresolved mental health issue[s] related to depression and is an admitted sociopath who can hurt himself or others"; and "never visited, contacted or made any attempt except for one telephone call to have a relationship with Dustin and Jason."

16

Several of Deanna's claims pertain to Joseph's conduct before they even met. As discussed, when he was 19 years of age he wrote in his diary "that he thought he was a sociopath," without knowing what the term meant. The social worker read the diary and was unconcerned. Joseph told Deanna that he had used drugs when he was 17 to 18 years of age, information she used against him along with the diary entry, but he told the social worker that he stopped using drugs before he met Deanna, and Deanna adduced no evidence to the contrary. As to Joseph's criminal history, he testified that he had been arrested three times for theft by check between 2003 and 2005, and that he had not been arrested since 2005.[6] Deanna does not explain how any of these stale issues affects Joseph's current ability to parent his sons. She points to no evidence to back up her assertion that Joseph "can hurt himself or others."

As to Joseph's supposed untreated depression, Lowrimore testified that Joseph denied having any mental health issues, and she saw no evidence of depression. She explained "[t]here has been no diagnosis from anybody that he has that or needs medication. He holds a full-time job. He takes care of the family. He has done everything I asked. He has come out here to visit. I see no evidence on that." Deanna's counsel asked Joseph, "Now, you told the social worker you have had . . . depression since you were 12; is that right?" He responded, "The depression was self-diagnosed. I have never been diagnosed officially with depression."

---

[6] Deanna was arrested for theft of personal property in 2013.

17

Further, the court could reasonably find that the domestic violence restraining order issued against Joseph in 2007 was groundless. The order arose from Deanna's accusation that Joseph shook Dustin and caused an indentation in his head, and an examination at Rady Children's Hospital disproved the accusation. Joseph conceded that he may have caused bruises on Dustin's arms by throwing him in the air and catching him too roughly, but he testified that he had not abused either boy and felt "badgered" into agreeing to the restraining order because Deanna had an attorney and he could not afford one.

The Agency also submitted evidence that Joseph attended therapy and completed parenting and anger management programs in conjunction with Deanna's 2007 accusation, but he was unable to present certificates of completion because of the passage of time. Joseph testified that he completed a voluntary services plan with the Agency. In 2007, the Agency informed the family court that it had completed its investigation and that the allegation of physical abuse against Joseph was unsubstantiated, but that he had complied with the terms of the restraining order.

As to Jason and Dustin's lack of a bond with Joseph, Joseph admitted that he had had no contact with them for approximately seven years, between the time he moved to Texas after losing his job and notification of the current proceedings. Deanna, however, disregards her role in the lack of contact. Joseph tried calling her, but she had changed

18

her phone number. He mailed her insurance information for the boys, but she moved without notifying him and it was returned as undeliverable.[7]

Joseph agreed that his lack of contact with the boys was not in their best interests, and he expressed remorse. He testified that he was now a stepparent to three children, and "it's become abundantly clear to me how important it is to have both parents in addition to stepparents in the lives of the children, where that was not clear before." When he learned of this case, he immediately began speaking with the boys over the phone and arranged for a visit.

Additionally, while a sibling bond is among the factors that may be considered in assessing detriment (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1426), Deanna appears to exaggerate the relationship between the boys and A.J. Dustin was asked whether he would be sad to leave his mom and sister in San Diego, and he responded, "Well, not my sister, because I really need a break of babies -- [¶] . . . [¶] -- [r]eally bad. [¶] . . . [¶] I just can't stand anymore babies, not even one more." Jason was asked whether he liked his sister, and he responded, "Yes, but also she's messy. She's not really friendly, but she just played around, and then you, like, tell her no, she just starts doing it bad." He was asked whether he wanted to keep seeing her, and he said, "Yeah, but also she's, like, really mean to other babies." These facts "provide no support for 'a finding that there was a probability that moving to [Texas] would have a devastating emotional impact' " on the

---

7      Joseph testified that he was behind in child support between 2008 and early 2010, but at the time of the hearing, his payments were current. It is unclear how he paid support when he was unaware of Deanna's whereabouts.

boys.  (*In re John M.* (2006) 141 Cal.App.4th 1564, 1570 (*John M.*), citing *Luke M.*, at p. 1426.)

As to Deanna's inability to travel to Texas, the custody order provides for phone contact between her and the boys twice a week, and for Joseph's "best efforts" to bring the boys to San Diego for visitation every other month.  While the situation is not ideal, and we do not doubt that the boys will miss her, this issue, standing alone, does not indicate detriment.

The Agency investigated Joseph and his current circumstances and recommended that he have custody of the boys.  Joseph traveled to California to testify in person, and the court was able to assess his credibility and sincerity.  Joseph said that he wants Jason and Dustin to live with him in Texas.  He has been married for five years and has three stepchildren.  He obtained enrollment documents from the school that the boys would attend and had "mostly filled them out."  He had also provided the school with the boys' immunization records, and a copy of Jason's IEP (individualized education plan). Because of Jason's special needs the school had already assigned his teacher, with whom Joseph was in regular contact.  An IEP meeting was scheduled for the day Jason enrolled, with another meeting to follow in 30 days.  Joseph planned to take the boys to therapy to help them adjust to the change, acknowledging "they are going to need somebody to talk to, somebody who is a third party, somebody who is trained."

We conclude that the evidence amply supports the disposition orders.  The issues that Deanna raises, whether considered alone or cumulatively, are insufficient to deny

20

Joseph custody. Deanna essentially asks that we reweigh the evidence, but that is not our province. (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

II

*Due Process Claim*

Deanna also contends that the court violated her federal constitutional right to due process by commencing the hearing in her absence. The due process clause of the Fourteenth Amendment to the United States Constitution "requires reasonable notice and opportunity to be heard before governmental action may deprive an individual of a significant property interest." (*Bergeron v. Department of Health Services* (1999) 71 Cal.App.4th 17, 23; *Logan v. Zimmerman Brush Co.* (1982) 455 U.S. 422, 428-438 & fn. 5.) Parents have a fundamental interest in the care, custody, and management of their children (*Santosky v. Kramer* (1982) 455 U.S. 745, 753), and a "constitutional right to due process . . . before the state may interfere with their parental rights. [Citation.] ' "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." ' " (*H.S. v. N.S.* (2009) 173 Cal.App.4th 1131, 1138.)

Specifically, Deanna asserts that her absence on the first day of the hearing precluded her from testifying on her own behalf, assisting her attorney in the cross-examination of witnesses, and presenting evidence on the issue of detriment. The assertion is absurd. On the first day of the hearing, the court heard only the testimony of Jason and Dustin, which Deanna had previously stipulated would be given in chambers without the parents' presence. (See § 350, subd. (b).) Deanna was in court for the second and third days of the hearing, during which the court did not impede her presentation in

21

any manner.  In considering whether she had a reasonable opportunity to be heard, we consider the entire hearing, not merely the session that she missed.  Deanna has not shown any due process violation.

Additionally, a rule of harmless error applies to juvenile court proceedings. (*In re A.M.* (2014) 224 Cal.App.4th 593, 598; *In re J.S.* (2011) 196 Cal.App.4th 1069, 1078.)  "Before any judgment can be reversed for ordinary error, it must appear that the error complained of 'has resulted in a miscarriage of justice.'  (Cal. Const., art. VI, § 13.) Reversal is justified 'only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' "  (*In re J.S.*, at p. 1079.)  Deanna cannot show prejudice arising from her absence on the first day of the hearing, because after viewing the videotape of the boys' testimony, she expressly waived her opportunity to recall them for further questioning.

Deanna attempts to show prejudice by complaining that she was not present to contest the court's order authorizing a visit for Jason and Dustin in Texas pending conclusion of the hearing.  However, her attorney objected to the order on her behalf. Further, the order was never effectuated.  Rather, it was automatically stayed for seven days (Code Civ. Proc., § 917.7), and when the hearing reconvened during that period, the

court granted Deanna's request to stay the order pending conclusion of the hearing.  The

court's grant of custody to Joseph on the final day of the hearing moots the issue.[8]

CONCLUSION

The orders are affirmed.

AARON, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.

---

[8] In a related vein, Deanna asserts that the court abused its discretion by denying her request for a continuance of the first day of the hearing.  We are not required to reach the issue, because even if the court arguably erred, she makes no showing of prejudice.