Filed 6/10/21 (unmodified opn. attached)

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| WILLIAM PHIPPS et al., | B302627 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 18STCV02021) |
| v. | |
| COPELAND CORPORATION LLC, | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN APPELLATE JUDGMENT] |
| Defendant and Appellant. | |

THE COURT:

The opinion filed on May 18, 2021 and certified for publication is modified as follows:

1.      On page 20, before the last full sentence in the top paragraph, which says "That takes care of Trane," add the following sentence:

Hall did not testify how many gaskets a Copeland compressor had, nor did Copeland introduce any evidence comparing the total number of gaskets in a Copeland compressor to the number in a Trane compressor.

2. On page 20, after the penultimate full sentence in the bottom paragraph, ending with the phrase "compared to Copeland's (reasonably inferred) 30," and before the sentence beginning with the phrase "For another," add the following sentence:

Hall did not compare the total number of gaskets in a Carrier compressor to the total in a Copeland, and Copeland did not present any testimony comparing those numbers.

3. On page 20, in the last full sentence of the bottom paragraph, beginning with the phrase "For another," add the word "thing" after "another," so that the sentence reads:

For another thing, there was no evidence of how many gaskets William tended to replace when "working on" a Carrier compressor; if he tended to replace only one or two, that would be half or less the number of gaskets he replaced when replacing a Copeland compressor.

Appellant's petition for rehearing is denied.

This order does not change the appellate judgment.

| PERLUSS, P. J. | SEGAL, J. | FEUER, J. |

2

Filed 5/18/21 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| WILLIAM PHIPPS et al., | B302627 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 18STCV02021) |
| v. | |
| COPELAND CORPORATION LLC, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Michele Flurer, Judge. Affirmed.

Sidley Austin, David R. Carpenter, Collin P. Wedel and Andrew B. Talai for Defendant and Appellant.

Shook, Hardy & Bacon and Patrick Gregory for Coalition for Litigation Justice, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

The Paul Law Firm, Joshua Paul, Peter Beirne; Bartlett Barrow, Brian P. Barrow and Jennifer L. Bartlett for Plaintiffs and Respondents.

# INTRODUCTION

William and Linda Phipps sued compressor-manufacturer Copeland Corporation LLC and others alleging they exposed William to asbestos that caused him to develop mesothelioma. By the end of trial, Copeland was the only defendant remaining in the case. The jury found Copeland liable, apportioned it 60 percent of the fault for William's harm, and awarded, among other damages, $25 million in noneconomic damages. On appeal from the judgment Copeland contends that substantial evidence did not support the jury's allocation of fault, that the trial court erred in denying a motion by Copeland for a new trial on the ground of excessive damages or for remittitur, and that the noneconomic damages award was excessive.

We hold that the defendant has the burden at trial to show the percentage of fault attributable to other parties who may have contributed to causing the plaintiff's harm and that Copeland has not met its burden on appeal to show as a matter of law the evidence compelled an apportionment of fault more favorable to Copeland. We also hold the trial court, in denying Copeland's motion for a new trial, did not err under Code of Civil Procedure sections 657 and 658 in declining to consider a spreadsheet created by Copeland's attorneys that presented a survey and comparative analysis of verdicts in California asbestos cases over a recent five-year period. Finally, we conclude substantial evidence supported the jury's award of noneconomic damages. Therefore, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *William Is Diagnosed with Mesothelioma, and the Phippses File This Action*

William Phipps was born in 1948, served from 1966 to 1969 in the United States Navy on the *U.S.S. Porterfield*, then spent most of his adult life employed as a heating, ventilation, and air conditioning (HVAC) technician. As an HVAC technician he serviced large commercial air conditioning units, which included working on their compressors. In April 2018, at the age of 69, he was diagnosed with mesothelioma.[1]

In October 2018 William and his wife, Linda, filed this action against Copeland and 22 other defendants for negligent failure to warn, negligent failure to recall, strict liability design defect, strict liability failure to warn, and loss of consortium, alleging the defendants caused William's mesothelioma by exposing him to asbestos they provided or manufactured. By June 2019, when the jury trial began, only four defendants remained in the case, and during trial all of those but Copeland settled.

---

[1] "Mesothelioma is a relatively rare cancer that occurs in the lining of the lung, which is called the pleura. [Citation.] As the cancer grows, it 'will eventually entrap the entire lung, creating the tightening effect of a corset by preventing the lung from expanding. The cancer also grows outward into the chest wall where it irritates nerve roots, creating pain. People with mesothelioma live, on average, 12 to 14 months.'" (*Phillips v. Honeywell Internat. Inc.* (2017) 9 Cal.App.5th 1061, 1068.)

B.	*Witnesses at Trial Testify About William's Exposure to Asbestos and Resulting Mesothelioma*

At trial witnesses testified William's mesothelioma was caused by his exposure to asbestos, which was present both on the *U.S.S. Porterfield* during his service there and in gaskets in air conditioning compressors he worked on from 1977 to 1991, including compressors manufactured by Copeland. Working on a compressor often involved replacing gaskets inside it, which required William to use a knife or chisel to scrape away the old gasket, releasing asbestos dust that he inhaled. William was also exposed to asbestos as a result of living for periods with his father, who as an electrician in the Navy came into contact with "asbestos-containing thermal insulation material."

Mesothelioma, according to Copeland's medical expert, is "a very dreadful disease," in which cancer is "chewing into the chest wall, and patients are dying in horrible pain because it attacks the nerves . . . . It is one of the worst cancers to have." Another expert opined that William, who was then 70 years old, would live "maybe another year or two." The trial court instructed the jury that the average life expectancy of a man William's age was another 14.5 years.

That's the short version. Because a longer version will help resolve the issues on appeal, we describe the testimony of some of the witnesses in more detail.

1.	*Dr. James Dahlgren*

Dr. James Dahlgren, an internist specializing in toxicology, testified there are two categories of "commercial asbestos fibers": chrysotile, the most commonly used commercial asbestos, and

4

amphibole,[2] which was used in thermal insulation on the *U.S.S. Porterfield* during William's service there and on ships on which William's father served as a Navy electrician. Dr. Dahlgren testified that "95 to 99 percent of all asbestos used in history is chrysotile" and that therefore "it's the main one . . . that causes mesothelioma," but that both categories of asbestos fiber "share similar toxicity" and "there's no difference" between them with regard to their "impact on individuals coming down with an illness from . . . exposures to asbestos." Dr. Dahlgren based his opinion that both categories of asbestos fibers "have similar toxicity levels" on animal-based studies showing both categories "have about the same effect in the lung and in the formation of mesothelioma and lung cancers." Having reviewed William's occupational history, William's medical records, and "dozens of articles . . . relevant to this case," Dr. Dahlgren opined that William was "exposed primarily to chrysotile," the type of asbestos used in gaskets in the compressors he worked on as an HVAC technician.

Dr. Dahlgren explained that "the primary route of exposure [to asbestos] is in the air. When the dust gets in the air, the person will breathe it, and if they don't have any protection, [if] there's no ventilation to remove the dust from their breathing zone, it goes . . . deep into the lung. The smaller fibers . . . get into the little pockets in the lung called alveoli and also . . . deposit in the bronchial tubes. And those fibers, most of them stay in the lung for the rest of the person's life. We think that's one of the reasons that they get cancer, because these little fibers actually penetrate the cell and cause DNA damage, and that

---

[2] Dr. Dahlgren explained there are, in turn, two kinds of amphibole fibers, crocidolite and amosite.

interferes with the function of the cell, and over time cancer forms." According to Dr. Dahlgren, "there's no safe levels of exposure" to asbestos, and "any exposure can increase the risk and does increase the risk" of developing mesothelioma. He stated that cancer associated with asbestos exposure was first reported in 1935 and that since then researchers have published "thousands" of papers "on the question of asbestos exposure and cancer."

Dr. Dahlgren testified the dust generated and inhaled when scraping away an old gasket made with asbestos was "a significant exposure" that "went well above the background level of asbestos that's just in the general air." Having explained asbestos exposure in this context is measured in fibers per cubic centimeter of air, Dr. Dahlgren cited studies examining asbestos "fiber levels associated with removing gaskets and cutting gaskets" that showed exposure levels as high as "28.4 fibers [per cubic centimeter] for 24 minutes, which means it was an acute, high level." Dr. Dahlgren stated, "OSHA [the Occupational Safety and Health Administration] has a peak level nowadays of one fiber [per cubic centimeter]. So that would be 28 times the short-term exposure limit."

2.     *William Phipps*

William testified that during his career as an HVAC technician he worked on two kinds of compressors, "hermetic" and "semi-hermetic." Hermetic compressors were sealed units that had to be replaced when they failed, a task that did not involve replacing any gaskets. Semi-hermetic compressors, by

6

contrast, could be taken apart and either repaired or "rebuilt,"[3] tasks that involved replacing gaskets inside the compressor. The number of gaskets that needed replacing depended "on what you're doing to" the compressor. A rebuild could mean replacing as many as 30 gaskets, although that number depended on the brand and size of the compressor. A repair might merely involve, for example, identifying "a leak where a gasket is blown out" and replacing that gasket. In addition, replacing an entire semi-hermetic compressor, without repairing or rebuilding it, involved replacing at least four gaskets. Scraping away old gaskets to replace them made the air dusty and left dust and pieces of gasket on the ground, which William had to sweep up and dispose of.

William recalled working on compressors manufactured by Copeland, Carrier Corporation, and Trane USA and helping "once or twice" rebuild one made by York International Corporation. From 1977 to 1991 William worked on 25 to 35 Copeland compressors per year. This figure included both hermetic and semi-hermetic Copeland compressors, though mostly the latter, and included all Copeland compressors he repaired, rebuilt, or replaced. He testified he "didn't really rebuild that many Copeland compressors because they weren't as big," which made them "easier to replace . . . than rebuild," whereas "a lot of Trane and Carrier compressors [he would] rebuild." Asked how often he would "replace . . . rather than repair" a semi-hermetic Copeland compressor, William answered, "It's hard to say. It depends on what was wrong with it. If the valves were bad, you'd do a valve

---

[3] "Rebuilding" a compressor required William to "take out everything and check it out and put in new bearings and new valves and new everything on it."

job on them because it was a lot easier to do the valve job than get the old one out and go get a new one." Even a valve job required replacing multiple gaskets.

William testified he never saw any warning about asbestos exposure on packages of Copeland replacement gaskets he purchased or on Copeland compressors he serviced. He was never "given any idea" there was any inherent danger in working on Copeland compressors, and he did not wear a mask or take other precautions to avoid breathing the dust from the gaskets he scraped.

### 3. *Bruce Hall*

Bruce Hall was a co-worker of William's in the HVAC industry. In 1977, when William began his HVAC apprenticeship at Western Air Refrigeration, Hall was a general foreman there. Hall estimated he worked on jobs with William "probably . . . 200 times." Asked what kind of compressors he saw William work on, Hall stated, "[William] worked on a lot of Copelands. He worked on other things, I'm sure, also. But Copeland seemed to be what he was tangled up with." Asked what kind of work he saw William performing on Copeland compressors, Hall stated that "a lot of times the top end expires on them, and you can get them back running by changing the valve plates and the head gaskets and whatever is entailed on the top end. . . . So there was a lot of valve plates being replaced to get them back up online real quick." Hall testified "there was a lot of gasket scraping involved" in working on the valve plates of a Copeland compressor. He stated he saw William scraping gaskets from Copeland compressors on "50 to a hundred" occasions, adding, "I mean, a lot of years' worth." Hall also testified that "on a large

Carrier compressor . . . you can have up to 18 gaskets total" and that "the Trane compressors roughly had 50 percent less gaskets than a Carrier because they don't have valve plates."

### 4. *Mark Gibson*

Copeland representative Mark Gibson testified that until 1987 all semi-hermetic Copeland compressors had many gaskets containing asbestos and that, prior to 1988, all its head gaskets and valve plate gaskets contained asbestos. The percentage of asbestos in the asbestos-containing gaskets Copeland used between 1930 and 1985 ranged from 20 to 85 percent. By April 1988 Copeland knew that the asbestos content of gaskets in its compressors was in this range and that some gaskets were in fact 85 percent chrysotile.

Gibson explained that part of Copeland's business is to tear down and refurbish, or "remanufacture," old compressors that are returned to the company. This process involves disassembling the compressor and removing all gaskets and other material from interior surfaces. Gibson testified that in 1988 Copeland hired an industrial hygienist to test and monitor asbestos levels in the air at Copeland, in particular for employees tearing down and remanufacturing old compressors. Gibson testified that "there was action taken based on results that were in the industrial hygienist reports," including that Copeland employees began wearing fitted respirators. At no time, however, did Copeland provide any warning to its customers about asbestos in its gaskets or warn of any danger in working on its compressors.

Gibson also testified that in the late 1980s Copeland began a "phase-out" of asbestos gaskets in its compressors. According to interoffice correspondence from July and August 1988, Copeland

at that time had an inventory of asbestos gaskets worth $1.3 million, which—to avoid losing the "dollar cost" of simply disposing of that material—it decided to "use up" before beginning to use non-asbestos gaskets. By February 1991, however, Copeland had not used up its asbestos material, and an interoffice memorandum from that date (subject: "Asbestos Gasket System Purge") announced the company would dispose of its remaining asbestos material, which "had to be thrown away . . . in specially marked bags." By 1992 all "asbestos-bearing gaskets were gone in both new and remanufactured compressors," and Copeland no longer supplied replacement gaskets containing asbestos. At no point during this process did Copeland advise customers its compressors contained asbestos.

C. *Counsel Make Their Closing Arguments, and the Jury Returns Its Verdict*

In beginning his closing argument, counsel for the Phippses acknowledged that they were not claiming Copeland "is the only entity that contributed to [William's] risk of developing mesothelioma," but stated that they were "here as the plaintiffs to prove [their] case against Copeland." Near the end of his argument counsel addressed noneconomic damages. He argued that, in light of William's intense physical pain, significantly reduced life expectancy, emotional suffering, and the loss of enjoyment of his family, among other things, "$50 million is a reasonable number." He also argued that, on Linda's cause of action for loss of consortium, "$25 million sounds like a reasonable number—half of what is a reasonable number for what [William] is going through." Counsel concluded by stating that the jury would have an opportunity to apportion fault for

William's harm among a number of parties and nonparties and that it was Copeland's burden to prove anyone other than Copeland contributed to William's harm. As for the "level" of fault the jury should apportion Copeland, counsel told the jury, "That's for you to decide, based on what they can prove." Counsel added: "Based on the evidence, Copeland Corporation, based on what you have in front of you, 80 percent? 80 percent fault?"

Counsel for Copeland argued it was not liable at all because William was not exposed to asbestos from working with gaskets in Copeland compressors or gaskets otherwise supplied by Copeland and because any exposure William had to asbestos gaskets in Copeland compressors was not a substantial factor in causing his mesothelioma. Counsel argued: "This is a classic case, ladies and gentlemen, where we can point directly to the cause of [William's] mesothelioma: his time in the Navy aboard the *Porterfield*." Counsel also emphasized William had additional exposure to asbestos supplied by the Navy as a result of living with his father while his father worked as an electrician for the Navy. "So the other companies that he's listed here," counsel stated, referring to the question on the verdict form concerning apportionment of fault, "those are simply other companies that he has claimed exposure to asbestos from." Counsel for Copeland concluded: "I'm not going to get into the issue of damages because I don't think you get there. The final questions that deal with apportionment of fault, what I would suggest to you, ladies and gentlemen, is that the plaintiffs . . . would be happy with a finding of one percent fault for Copeland."

The jury found Copeland liable on all causes of action. It awarded $1.369 million in economic damages (a figure the parties had stipulated to), $5 million in past noneconomic damages,

11

$20 million in future noneconomic damages, and $250,000 for Linda's loss of consortium claim. Question 21 on the special verdict form read: "Assuming that 100% represents the total fault for the injury, damage, loss or harm to plaintiff William Phipps, what percentage of this 100% is attributable to the negligence, or fault based on defective products or failure to warn, if any, to the following: [¶] [Include a percentage only for those that were a substantial factor contributing to plaintiff William Phipps' risk of developing mesothelioma?]." The verdict form then listed the following parties and nonparties, to which the jury assigned the following percentages: Copeland, 60 percent; the Navy, 17 percent; Western Air Refrigeration, 10 percent; Trane, 3 percent; Carrier, 3 percent; York, 3 percent; and nine others, to each of which the jury assigned a percentage between zero and one inclusive.

D.     *The Trial Court Denies a Motion by Copeland for New Trial or Remittitur*

Copeland filed a motion for new trial (Code Civ. Proc., § 657)[4] or, in the alternative, remittitur (§ 662.5, subd. (a)(2)). Copeland argued that the evidence did not support finding "causation as to Copeland" or allocating Copeland 60 percent of the fault for William's harm and that the award of noneconomic damages was excessive. In support of the latter contention, Copeland submitted a spreadsheet labeled "Plaintiff Verdict Amounts in Asbestos/Mesothelioma Cases." An accompanying declaration explained that the spreadsheet was the result of "a process for obtaining comparative verdicts in cases that, similar

---

[4]     Undesignated statutory references are to the Code of Civil Procedure.

to this one, involved allegations of asbestos exposure leading to mesothelioma."[5] The spreadsheet identified 15 cases, for each of which it displayed information in seven columns: (1) the plaintiff's surname, (2) the case number, (3) the date of the verdict, (4) the amount of past noneconomic damages, (5) the amount of future noneconomic damages, (6) the total amount of noneconomic damages, and (7) the ratio of past to future noneconomic damages. Below the spreadsheet, a table displayed the mean and the median for columns (4), (5), and (6). Copeland included copies of the verdicts filed in the cases (or, for some cases, judgments reflecting the verdicts filed in the cases). Copeland argued its survey showed the amount of the noneconomic damages award in this case was "well beyond the normal range of awards in similar cases for similar injuries."

The trial court denied the motion. After reviewing the evidence concerning causation and allocation of fault, the court ruled there was no basis to disturb the jury's findings. On the issue of noneconomic damages, the court sustained a relevance objection by the Phippses to counsel for Copeland's spreadsheet

_____

[5] The declaration described the process: "As a first step, we used Lexis Advance® Verdict Analyzer to generate a list of California state court asbestos/mesothelioma verdicts in favor of plaintiffs over the past five years (2015-2019). We used that list to pull the as-filed verdict forms (where available) from the respective court websites. We then reviewed the verdict forms to limit the list of cases to those involving personal injury claims by a plaintiff with mesothelioma (as opposed to wrongful death brought by heirs). We included in our final list of cases all verdicts that we were able to obtain and that matched the criteria above, except for those that we identified as involving default judgments or as having settled prior to entry of judgment."

13

survey of other verdicts, stating: "The Court does not believe it is proper for this Court to consider the case summaries for any comparative analysis or to determine an appropriate amount for an award in this matter. The Court does not consider the evidence for the purpose of establishing a threshold or ratio. This Court looks only to the evidence presented in this case, to determine if the verdict is supported. While such cases may help determine if an award results from passion or prejudice, they cannot be used to determine an appropriate amount in a particular case." The court ruled that, "[h]aving heard Mr. Phipps's testimony, and those of the experts and other witnesses," it could not find the jury's past or future noneconomic damages awards were unsupported. Copeland timely appealed.

## DISCUSSION

A. *The Evidence Did Not Compel a Different Apportionment of Fault*

1. *Applicable Law and Standard of Review*

"In the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products, *and* must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury. . . . [T]he plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the

14

plaintiff's or decedent's *risk* of developing cancer." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982 (*Rutherford*); accord, *LAOSD Asbestos Cases* (2020) 44 Cal.App.5th 475, 488; see *Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 975 (*Izell*) ["As our Supreme Court explained in *Rutherford*, '[t]he substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.'"].)

"And although a defendant cannot escape *liability* simply because it cannot be determined with medical exactitude the precise contribution that exposure to fibers from defendant's products made to plaintiff's ultimate contraction of asbestos-related disease, all joint tortfeasors found liable as named defendants will remain entitled to limit *damages* ultimately assessed against them in accordance with established comparative fault and apportionment principles." (*Rutherford, supra*, 16 Cal.4th at p. 958.) The defendant "may reduce its own comparative fault by pointing the finger at other tortfeasors, including those who are not party to the case." (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 202 (*Soto*).)

"The comparative fault doctrine 'is designed to permit the trier of fact to consider all relevant criteria in apportioning liability. The doctrine "is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, or other theories of responsibility), in order to arrive at an 'equitable apportionment or allocation of loss.'" [Citation.]' [Citations.] For this reason, comparative negligence 'does not lend itself to "the

15

exact measurements of a micrometer-caliper.""" (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1285 (*Pfeifer*).)

"Generally, a defendant has the burden of establishing that some nonzero percentage of fault is properly attributed to the plaintiff, other defendants, or nonparties to the action." (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1285; accord, *Soto*, *supra*, 239 Cal.App.4th at p. 202.) More specifically, a defendant has "the burden to establish concurrent or alternate causes by proving: that [the plaintiff] was exposed to defective asbestos-containing products of other companies; that the defective designs of the other companies' products were legal causes of the plaintiffs' injuries; and the percentage of legal cause attributable to the other companies." (*Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 478 (*Sparks*); accord, *Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 33 (*Stewart*), disapproved on another ground in *Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 188.)

Some cases have stated that we review a jury's findings on comparative fault "for the existence of substantial evidence. [Citations.] On review for substantial evidence, we 'consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving conflicts in support of the judgment. [Citation.]' [Citation.] Under this standard, '"the appellate court may not substitute its judgment for that of the jury or set aside the jury's finding if there is any evidence which under any reasonable view supports the jury's apportionment. [Citation.]"' [Citations.] For this reason, courts rarely disturb the jury's apportionment of fault." (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1286.)

Where, as here, however, "'the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals,'" generally "'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 (*Dreyer's*); accord, *Glovis America, Inc. v. County of Ventura* (2018) 28 Cal.App.5th 62, 71; *Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734.)

### 2. *Analysis*

Copeland does not challenge the jury's finding that William's exposure to asbestos from Copeland compressors was a substantial factor contributing to his risk of developing cancer, i.e., the "causation" finding regarding Copeland. Copeland does, however, challenge the jury's apportionment of comparative fault, arguing it was "illogical, unfair, and unsupported by evidence." More specifically (if only marginally so), Copeland argues the evidence did not support "assigning twenty times more fault to Copeland than to any of the other compressor manufacturers, and more fault than all other entities *combined*."

But as the party with the burden to establish the percentage of comparative fault attributable to others (*Sparks*, *supra*, 32 Cal.App.4th at p. 478; *Stewart*, *supra*, 190 Cal.App.4th at p. 33), Copeland, to obtain a reversal, must show the evidence compelled a verdict in its favor on apportionment as a matter of

17

law.  (See *Dreyer's*, *supra*, 218 Cal.App.4th at p. 838.)  At a minimum, this means Copeland must demonstrate its percentage of comparative fault could not, as a matter of law, be as large as 60 percent.[6]  Copeland has failed to do so for at least two reasons.

First, Copeland's contention the apportionment verdict was "illogical," etc. rests on Copeland's insistence the undisputed evidence established that, "among the four relevant compressor manufacturers"—Copeland, Carrier, Trane, and York— "Copeland exposed [William] to less asbestos . . . than the other companies" (italics omitted).  Put differently, Copeland asserts "there is no evidence, substantial or not, to support a finding that Copeland was responsible for more asbestos exposure than *any* of the other three main compressor companies."  But that is not so, especially when we view the evidence, as we must, in the light most favorable to the Phippses.  Assuming, as Copeland argues, uncontradicted evidence established the four relevant compressor

---

[6]     It is possible to read *Stewart*, *supra*, 190 Cal.App.4th 23 as requiring Copeland to specify the amount of fault that must, as a matter of law, be allocated to others.  (See *id*. at pp. 33, 38 [affirming a verdict allocating 85 percent of comparative fault to a defendant where, although the plaintiff admitted exposure to asbestos from other sources, the defendant did not present evidence at trial detailing that exposure and, in arguing on appeal its "fault should have been allocated to other entities," the defendant did "not specify which entities or how much fault"].)  Which Copeland has not done.  The closest it comes is asserting that the "undisputed evidence required finding Copeland less responsible than the other [compressor] manufacturers" (italics omitted) and that, "[a]t most, the evidence might support a roughly equal apportionment of fault between the compressor companies."  As we will discuss, these assertions regarding the evidence are not accurate.

18

manufacturers' gaskets exposed William in equal degree (per gasket) to asbestos, the amount of asbestos to which each company exposed William depended on the number of each company's gaskets he replaced. Uncontradicted evidence did not compel a finding that William replaced fewer Copeland gaskets than he did Carrier, Trane, or York gaskets.

William estimated he worked on as many as 35 Copeland compressors each year for 14 years, a total of nearly 500 Copeland compressors, most of them semi-hermetic. His work on these semi-hermetic compressors included rebuilds that involved replacing up to 30 gaskets, repairs that could involve replacing one or more gaskets, and replacements of entire compressor units, which involved replacing four gaskets. As Hall testified, he saw William scraping "a lot of years' worth" of Copeland gaskets. As for York compressors, not so much: William testified he worked on a York compressor only "once or twice."

William testified he also worked on Trane compressors, but he did not indicate how often, either in absolute terms or in relation to other brands. He did testify he *rebuilt* Trane compressors more often than he did Copeland compressors, but that covers only one of the three categories of gasket-replacing work (rebuilds, repairs, and replacements of entire units) William did on compressors.[7] No evidence compelled a finding that, considering the evidence regarding all three categories of gasket-replacing work, William rebuilt so many more Trane compressors than Copeland compressors that he necessarily replaced more

---

[7]     Notably, Hall testified Trane compressors did not have valve plates, an item William commonly repaired on Copeland compressors.

Trane gaskets than Copeland gaskets. In fact, the evidence did not compel a finding William replaced more Trane gaskets than Copeland gaskets even in the "rebuilds" category. Asked "how many gaskets are . . . in a compressor," i.e., without regard to brand, William testified "there's probably 30 gaskets in the darn thing." The jury could reasonably infer that this figure applied to Copeland compressors and that rebuilding a Copeland compressor therefore involved replacing as many as 30 gaskets. Hall testified that a Trane compressor, on the other hand, had a total of only nine gaskets (50 percent of a Carrier compressor's maximum total of 18)—which meant William could have rebuilt three times as many Trane compressors as Copeland compressors and still not have replaced as many Trane gaskets as Copeland gaskets in the rebuilds category. That takes care of Trane.

And Carrier? That's a slightly closer question, at least at first blush: Not only did William testify that he rebuilt more Carrier compressors than Copeland compressors, he also testified, as Copeland points out, that he "worked on" more Carrier compressors than any other brand. Still, that testimony does not compel a finding William rebuilt and generally "worked on" so many more Carrier compressors than Copeland compressors that he necessarily replaced more Carrier gaskets. For one thing, according to Hall, rebuilding a Carrier compressor meant replacing a maximum of 18 gaskets, compared to Copeland's (reasonably inferred) 30. For another, there was no evidence of how many gaskets William tended to replace when "working on" a Carrier compressor; if he tended to replace only one or two, that would be half or less the number of gaskets he replaced when replacing a Copeland compressor. And last, the jury could reasonably interpret Hall's statement that, although

20

he was sure William worked on other things, "Copeland seemed to be what he was tangled up with" as conflicting with William's testimony that he worked on more Carrier compressors than other brand compressors. Particularly because Hall was the more experienced at the time in the HVAC field, the jury could reasonably believe Hall rather than William. (See *Morgan v. J-M Manufacturing Co., Inc.* (2021) 60 Cal.App.5th 1078, 1086 ["'[i]t is well settled that the trier of fact may accept part of the testimony of a witness and reject another part'"].) And so that's Carrier.

The second reason Copeland has failed to demonstrate the evidence compelled a verdict in its favor on apportionment as a matter of law is that "the jury was permitted to consider the relative culpability of the parties in assessing comparative fault." (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1289; see *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 742 [principles of comparative fault "elevate justice and equity above the exact contours of a mathematical equation"]; *Pfeifer*, at pp. 1289-1290 ["the jury was permitted to increase [the defendant's] share of liability because it determined that [the defendant's] misconduct was more egregious than the Navy's misconduct"]; *Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 148 [the jury in a personal injury action could assign greater comparative fault to the "more culpable" defendants].) As one treatise explains, the "factors for assigning percentages of responsibility to each person whose legal responsibility has been established include . . . [¶] . . . [t]he 'nature of the person's risk-creating conduct,' including any awareness or indifference with respect to the risks created by the conduct and any intent with respect to the harm created by the conduct." (6 Witkin, Summary of Cal. Law (11th ed. 2020) Torts, § 1489.)

21

The Phippses presented evidence from which the jury could reasonably infer that, although by 1988 Copeland knew the work of removing asbestos gaskets from its compressors could be dangerous, and even warranted having Copeland employees who performed that work wear a respirator, it chose not to warn others, like William, who regularly performed such work and, instead of disposing of its asbestos gasket inventory, tried for three years to use it up.  These were years William was working on Copeland compressors.  This evidence, which was specific to Copeland, supported an inference that Copeland, alone among those who exposed William to asbestos, was consciously indifferent to the risks of doing so.  The jury was entitled to increase Copeland's share of fault accordingly.  (See *Pfeifer*, *supra*, 220 Cal.App.4th at pp. 1289-1290 [the jury could apportion the defendant a greater share of liability compared to the Navy because "the evidence supported the inference that [the defendant] was consciously indifferent to the dangers that its products posed to consumers [citation], while the Navy was merely negligent regarding those dangers"].)

Pointing out that the trial court granted a motion by Copeland for summary adjudication on the Phippses' punitive damages claim, Copeland argues permitting the jury to increase its share of liability based on "moral blameworthiness" would amount to "an impermissible form of punitive liability."  Based on the evidence, however, the jury could reasonably find that Copeland's indifference, though justifying a finding Copeland was more culpable than the other manufacturers, did not rise to the level of the """extreme indifference""" required for punitive damages.  (*Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 455.)  Copeland also argues permitting the jury to consider

relative culpability in apportioning fault conflicts with "Proposition 51, which 'shields every "defendant" from any share of noneconomic damages beyond that attributable to his or her own comparative fault'" (quoting *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 602).[8]  But that argument begs the question:  As discussed, a defendant's comparative fault includes its relative culpability.

Finally, even assuming, as Copeland argues, it had the burden to prove only that a nonzero percentage of fault was attributable to other entities, with no burden to prove the percentage attributable to them, so that the jury's allocation of fault is simply subject to review for substantial evidence, substantial evidence supported allocating Copeland 60 percent. Dr. Dahlgren testified William's primary exposure was to chrysotile, the kind of asbestos used in compressor gaskets he replaced, rather than to amphibole, the kind of asbestos used in insulation on the *U.S.S. Porterfield* during William's Navy service and on ships on which his father served.  The evidence showed a large number of the asbestos gaskets William replaced were in Copeland compressors.  As discussed, the evidence

---

[8]     "Proposition 51 amended [Civil Code] section 1431 and added [Civil Code] section 1431.2," the latter of which "declares that in actions for wrongful death, personal injury, or property damage based on comparative fault, 'the liability of each defendant for non-economic damages shall be several only and shall not be joint.'  The statute further specifies that '[e]ach defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault . . . .'" (*DaFonte v. Up-Right, Inc.*, *supra*, 2 Cal.4th at pp. 599-600; see Civ. Code, §§ 1431.1, 1431.2.)

relating to other brand compressors either showed William replaced fewer gaskets in them or left gaps in which the jury could only speculate on the relative number of gaskets he replaced in them. As also discussed, the Phippses presented evidence of Copeland's greater culpability, based on which the jury could increase Copeland's share of comparative fault. In light of these considerations, we cannot say allocating Copeland 60 percent of the comparative fault was unreasonable. (See *Pfeifer*, *supra*, 220 Cal.App.4th at pp. 1286, 1289-1290 [substantial evidence supported allocating 70 percent of the comparative fault to the defendant and 12.5 percent to the Navy where "over half of [the plaintiff's] exposure to asbestos from [the defendant's] products occurred after he left the Navy," the jury lacked evidence "quantifying [the plaintiff's] exposure to asbestos from the other sources," and the evidence supported an inference the defendant "was consciously indifferent to the dangers its products posed"].)

B.      *The Trial Court Did Not Err in Denying Copeland's Motion for a New Trial or Remittitur*

1.      *Applicable Law and Standards of Review*

"'Noneconomic damages compensate an injured plaintiff for nonpecuniary injuries . . . . ' [Citation.] Such injuries include pain and suffering, emotional distress, as well as 'such items as invasion of a person's bodily integrity (i.e., the fact of the injury itself), disfigurement, disability, impaired enjoyment of life, susceptibility to future harm or injury, and a shortened life expectancy.'" (*Burchell v. Faculty Physicians & Surgeons of the Loma Linda University School of Medicine* (2020) 54 Cal.App.5th

515, 526 (*Burchell*); see *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1332 (*Corenbaum*) ["Pain and suffering is a unitary concept that encompasses physical pain and various forms of mental anguish and emotional distress."].) "Such injuries are subjective, and the determination of the amount of damages by the trier of fact is equally subjective. [Citation.] There is no fixed standard to determine the amount of noneconomic damages. Instead, the determination is committed to the discretion of the trier of fact." (*Corenbaum*, at p. 1332.)

As the Supreme Court has explained: "One of the most difficult tasks imposed upon a jury in deciding a case involving personal injuries is to determine the amount of money the plaintiff is to be awarded as compensation for pain and suffering. No method is available to the jury by which it can objectively evaluate such damages, and no witness may express his subjective opinion on the matter. [Citation.] In a very real sense, the jury is asked to evaluate in terms of money a detriment for which monetary compensation cannot be ascertained with any demonstrable accuracy. . . . 'Translating pain and anguish into dollars can, at best, be only an arbitrary allowance, and not a process of measurement, and consequently the judge can, in [the judge's] instructions, give the jury no standard to go by; [the judge] can only tell them to allow such amount as in their discretion they may consider reasonable. . . . The chief reliance for reaching reasonable results in attempting to value suffering in terms of money must be the restraint and common sense of the jury.'" (*Beagle v. Vasold* (1966) 65 Cal.2d 166, 172; accord, *Corenbaum*, *supra*, 215 Cal.App.4th at pp. 1332-1333.)

Thus, "'[t]he amount of [noneconomic] damages is a fact question, first committed to the discretion of the jury and next to

the discretion of the trial judge on a motion for new trial.'" (*Burchell*, *supra*, 54 Cal.App.5th at p. 527; accord, *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506 (*Seffert*); see § 657 [a "new trial shall not be granted upon the ground of . . . excessive or inadequate damages . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the . . . jury clearly should have reached a different verdict or decision"].) The jury and the trial judge "see and hear the witnesses and frequently . . . see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court." (*Seffert*, at pp. 506-507; accord, *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 299 (*Bigler-Engler*).) "We will not disturb the trial court's ruling on a motion for new trial unless the record reveals a manifest and unmistakable abuse of discretion." (*Soto*, *supra*, 239 Cal.App.4th at p. 200; see *Charles D. Warner & Sons, Inc. v. Seilon, Inc.* (1974) 37 Cal.App.3d 612, 616; see also *Pearl v. City of Los Angeles* (2019) 36 Cal.App.5th 475, 486 ["We review the trial court's use of its power of remittitur to reduce excessive damages for abuse of discretion."].)

### 2. *Analysis*

Copeland contends the trial court abused its discretion in denying Copeland's motion for a new trial or remittitur because the trial court's "categorical refusal to consider verdicts in similar cases was a reversible legal error." (See *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393 [a judicial decision resting on a mistaken legal premise is an abuse of discretion].) Copeland refers primarily to the

court's refusal to consider counsel for Copeland's spreadsheet survey of verdicts in other mesothelioma cases, which the court ruled inadmissible. Copeland also appears to suggest the trial court "declined to address" a published decision Copeland cited, *Izell*, *supra*, 231 Cal.App.4th 962, which affirmed a trial court's order reducing an award of noneconomic damages for a mesothelioma plaintiff from $15 million to $3 million. (See *id.* at pp. 980-981.)

The trial court did not abuse its discretion in refusing to consider Copeland's survey of awards in other cases because, if for no other reason,[9] sections 657 and 658 prohibited the court from considering such material. "Sections 657 and 658 establish seven grounds for a new trial, which fall into two groups. Motions seeking a new trial on the first four grounds [irregularity in the proceedings, misconduct of the jury, accident or surprise, and newly discovered evidence] 'must be made upon affidavits' . . . . [¶] In contrast, motions relying on the remaining three grounds [excessive or inadequate damages, insufficiency of the evidence, and error in law] 'must be made on the minutes of the

---

[9] "'We will affirm the trial court's ruling if it is correct on any theory of law applicable to the case, even if for reasons different than those given by the trial court.'" (*Uspenskaya v. Meline* (2015) 241 Cal.App.4th 996, 1002, fn. 7; accord, *Conservatorship of McQueen* (2014) 59 Cal.4th 602, 612; see *Ceja v. Department of Transportation* (2011) 201 Cal.App.4th 1475, 1483 ["if the exclusion of evidence is proper on any theory, the exclusion must be sustained"]; see also *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 330 ["[a]n objection to evidence is but a reason offered for its exclusion," and if the objection is "sustained, and there appears any other reason for which the evidence should have been excluded, the ruling must stand"].)

court.' [Citation.]  Here, '[t]he "minutes of the court" include the records of the proceedings entered by the judge or courtroom clerk, showing what action was taken and the date it was taken [citation] and may also include depositions and exhibits admitted into evidence and the trial transcript.'" (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1192; see §§ 657, 658, 660.)

In moving for a new trial on the ground of excessive damages, Copeland was required to do so "on the minutes of the court." (§ 658.)  The survey Copeland prepared and submitted in support of its motion were not among the minutes of the court.  Therefore, the trial court could not consider that material.  (See *Maroney v. Iacobsohn* (2015) 237 Cal.App.4th 473, 484-485 ["'[b]ecause new trial motions are creatures of statute, "the procedural steps . . . for making and determining such a motion are mandatory and must be strictly followed"'"]; *People v. Southern Cal. Edison Co.* (1976) 56 Cal.App.3d 593, 601 ["'It is well established that the proceedings on a motion for new trial are strictly statutory, and the procedure for seeking relief must conform strictly to the statutory mandate.'"].)

The court's decision in *Frost v. Southern Pacific Co.* (1960) 177 Cal.App.2d 40 confirms the trial court here acted properly.  After the plaintiffs in that personal injury case obtained a favorable jury verdict, the defendant filed a motion for a new trial on all statutory grounds and submitted an affidavit purporting to relate newly discovered evidence suggesting one of the plaintiffs was not as badly injured as she claimed.  (*Id.* at pp. 40-41.)[10]  The

---

[10]    A few days after the plaintiffs prevailed at trial, one of the plaintiffs was observed exhibiting "a marked improvement over

28

trial court granted the motion for new trial on damages only. (*Id.* at p. 41.) The plaintiffs appealed, arguing the trial court improperly used the affidavit "as a basis for granting a new trial upon the ground that the evidence was insufficient to support the award of damages." (*Id.* at p. 42.) Although the court in *Frost* rejected that argument, concluding the trial court correctly determined "whether the evidence that was submitted to the jury justified the amounts awarded as damages" (*ibid.*), the court stated it would have been error to consider the affidavit. The court held: "In considering the verdict in the light of the evidence the court was required to determine whether the sums awarded were in accordance with or opposed to the weight of the evidence. [Citation.] It would have been improper for the court to take into consideration in that connection evidence adduced on the hearing of the motion. The affidavit could not properly have been considered in determining whether the verdict was for amounts in excess of those that would have been justified by the evidence." (*Ibid.*) The same rule applies here: The court would have erred had it considered Copeland's survey of awards in other cases.

This rule is further illustrated by *Campbell v. Bradbury* (1918) 179 Cal. 364, where the Supreme Court affirmed the trial court's order denying the defendants' motion for a new trial on the ground of excessive damages. (*Id.* at pp. 366-367, 374-375.) The Supreme Court stated: "It was the duty of the trial judge, upon the motion for new trial, to consider the testimony, and if the verdict was in his judgment too large, to either provide for a reduction of the judgment, or in default thereof, grant a new trial." (*Id.* at p. 375.) The Supreme Court then addressed

the condition she allegedly had described at the trial . . . ." (*Frost v. Southern Pacific Co., supra,* 177 Cal.App.2d at pp. 40-41.)

affidavits the defendants submitted in support of their motion, which described certain unfavorable courtroom conditions "[f]or the purpose of proving 'passion or prejudice' on the part of the jury in awarding damages." (*Ibid*.) Citing section 658, the Supreme Court stated: "It is sufficient to say upon this subject that on the question of excessive damages, these affidavits were not admissible as evidence." (*Campbell*, at p. 375.)

But what about the filed verdicts (and filed judgments reflecting those verdicts) that accompanied Copeland's survey—could the trial court have considered them as "minutes of the court," albeit minutes of the court in other cases? Putting aside the linguistic difference between the minutes of "the" court and the minutes of "a" court (see *Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1396 ["[u]se of the indefinite articles 'a' or 'an' signals a general reference, while use of the definite article 'the' . . . refers to a specific person, place, or thing"]), stretching "minutes of the court" in section 658 to include minutes of the court in other cases would have allowed the trial court to consider only the bare, as-filed verdicts and judgments. There would be nothing to explain how these cases were selected (and thus how representative of "similar cases" they were), no underlying facts from the cases (and thus little assurance they were in fact "similar"), and no indication whether the verdicts had survived posttrial challenges or appellate review. Absent any contextual information about those filed verdicts (and judgments), we could not say the trial court abused its discretion in ruling the material was insufficiently informative to be relevant and was therefore inadmissible. (See *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281 ["[w]e review a trial court's evidentiary rulings for abuse of discretion," and "[t]his is particularly so with

30

respect to rulings that turn on the relevance of the proffered evidence"].)

In the only case Copeland cites approving a trial court's consideration of awards in other cases when ruling on a motion for new trial on the ground of excessive or inadequate damages, *Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, it appears the trial court looked only to (presumably published) Court of Appeal and Supreme Court decisions. (See *id.* at p. 1055 ["the totality of the record reflects that the trial court's review of the awards in other appellate and Supreme Court decisions were used only for guideline purposes, in conjunction with a review of other factors and the evidence"].) The Phippses do not address *Sprague.* But they rely heavily on *Bigboy v. County of San Diego* (1984) 154 Cal.App.3d 397, where the court reversed a trial court's order granting a new trial on the ground of excessive damages, stating: "We conclude the trial judge's personal opinion based on the ranges of awards in other cases does not show the jury should have clearly reached a different verdict in this case and is therefore an irrelevant consideration, not a lawful basis, for granting the new trial order and issuing the remittitur." (*Id.* at p. 407.) It is not clear whether the *Bigboy* court's reference to "awards in other cases" included awards in published decisions.

But even assuming that under *Sprague v. Equifax, Inc.*, *supra*, 166 Cal.App.3d 1012 (or any other authority) it would have been error for the trial court here to categorically refuse to consider awards in published decisions, there is no indication the court did that; it simply didn't mention the published decision Copeland cited. The court's decision not to consider awards in other cases appeared under the heading "Evidentiary Objection and Ruling as to Defendant's Case Summaries" and concerned,

31

specifically, the "case summaries" presented in Copeland's survey. We do not assume the trial court made a silent, erroneous ruling on the propriety of considering awards in published decisions. (See *IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 639 [""'Error is never presumed.'""].) And Copeland does not argue the trial court's mere failure to mention *Izell*, *supra*, 231 Cal.App.4th 962 constituted an abuse of discretion.

In the absence of any other case authority approving a trial court's consideration of awards in other cases (in published decisions or otherwise), Copeland makes the following argument: Because appellate courts "can and do consider amounts awarded in past cases for similar injuries when reviewing non-economic damages awards for excessiveness," "it follows that trial courts must be permitted to review the same information" (italics omitted). To the extent Copeland refers to considering awards in published decisions, which we agree with the parties an appellate court may do (see *Seffert*, *supra*, 56 Cal.2d at p. 508 ["[w]hile the appellate court should consider the amounts awarded in prior cases for similar injuries, obviously, each case must be decided on its own facts and circumstances"]), we need not decide whether a trial court may consider such awards because, as discussed, Copeland has not shown the trial court here ruled it could not do so. Insofar as Copeland refers to considering the sort of information it prepared and presented to the trial court in its survey, however, Copeland has failed to establish its premise: It cites no authority suggesting an appellate court may consider such material. And we are unaware of any.

32

C.    *The Award of Noneconomic Damages Was Not Excessive*

1.    *Standard of Review*

Appellate review of the jury's determination of noneconomic damages is "'very narrow.'"  (*Soto*, *supra*, 239 Cal.App.4th at p. 199; see *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 614 (*Rufo*).)  "It must be remembered that the jury fixed these damages, and that the trial judge denied a motion for new trial, one ground of which was excessiveness of the award.  These determinations are entitled to great weight. . . .  The power of the appellate court differs materially from that of the trial court in passing on this question.  An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury."  (*Seffert*, *supra*, 56 Cal.2d at p. 506; accord, *Soto*, at p. 199; see *Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968, 985 ["The jury 'is entrusted with vast discretion in determining the amount of damages to be awarded,' and a reviewing court will reverse or reduce the award only ""where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice."""].)

"Accordingly, '[w]e review the jury's damages award for substantial evidence, giving due deference to the jury's verdict and the trial court's denial of the new trial motion.'"  (*Burchell*, *supra*, 54 Cal.App.5th at p. 527; see *Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 300.)  "[T]he appellate court must consider the whole record, view the evidence in the light most favorable to

33

the judgment, presume every fact the trier of fact could reasonably deduce from the evidence, and defer to the trier of fact's determination of the weight and credibility of the evidence." (*Rufo*, *supra*, 86 Cal.App.4th at p. 614.)

>2.     *Analysis*

Copeland argues the noneconomic damages award here was excessive.  Substantial evidence, however, supported the award. Among other such evidence, medical experts testified at trial that mesothelioma is "a very dreadful disease," is "one of the worst cancers to have," and results in "patients . . . dying in horrible pain" as the disease, in essence, suffocates them.  William described how fluid had begun to build up in his lungs and how that felt ("you can't breathe . . . you can't take in any air"), his increasing lack of physical energy and diminished activity ("I used to get out all the time and trim the bushes and do things. . . .  Now I can't do anything."), the painful treatments to drain his lungs ("you feel so much better afterwards that it's worth the pain"), and the chemotherapy sessions that would continue for the rest of his life.  Linda testified that prior to his medical treatment for mesothelioma William "had never been to the hospital in his entire life" ("He had never had any kind of surgeries.  He had never had any kind of nothing.") and that after his diagnosis his personality changed so that he was "angry" and "very depressed."  As a result of his mesothelioma, William's life expectancy was reduced from 14.5 years to one or two.

Copeland asserts the noneconomic damages award was "the result of passion and prejudice," but does not cite anything to suggest improper considerations influenced the award.  (See *Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 299 ["relevant

34

considerations include inflammatory evidence, misleading jury instructions, improper argument by counsel, or other misconduct"].)  Indeed, the record strongly suggests the jury eschewed passion or prejudice:  Counsel for the Phippses recommended a finding of 80 percent fault against Copeland, but the jury apportioned it only 60 percent; counsel argued for $50 million in noneconomic damages, but the jury awarded half that; and counsel asked for $25 million on the cause of action for loss of consortium, of which the jury awarded but a tenth.  (Cf. *Buell-Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525, 553 [jury's award of 13 times the amount counsel for plaintiffs requested in noneconomic damages and three times the amount requested for loss of consortium indicated jury acted out of passion and prejudice], disapproved on another ground in *Kim v. Toyota Motor Corp.* (2018) 6 Cal.5th 21, 38, fn. 6.)  The significantly lower-than-requested damages awards are especially significant given that counsel for Copeland did not even bother to rebut the arguments made by counsel for the Phippses.

Copeland's only substantive argument is that a comparison of the size of the award here with the size of the awards in its survey and in *Izell*, *supra*, 231 Cal.App.4th 962 shows the award here is excessive.  But as the court explained in *Rufo*, *supra*, 86 Cal.App.4th 573:  "This method of attacking a verdict was disapproved by our Supreme Court in *Bertero v. National General Corp.* [(1974)] 13 Cal.3d 43, 65, footnote 12, where it said, 'Defendants have compiled a lengthy list of judgments awarding damages which have been reversed on appeal as excessive.  Those cases do not, in and of themselves, mandate a reversal here.  The vast variety of and disparity between awards in other cases

35

demonstrate that injuries can seldom be measured on the same scale. The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact. For a reviewing court to upset a jury's factual determination on the basis of what other juries awarded to other plaintiffs for other injuries in other cases based upon different evidence would constitute a serious invasion into the realm of factfinding . . . . Thus, we adhere to the previously announced and historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice on the part of the jurors. We cannot conclude that the award of damages could be so characterized in the instant case.'" (*Rufo*, at p. 616; see *id.* at pp. 614-616 [affirming an $8.5 million award of noneconomic damages where the defendant's argument on appeal "essentially comes down to this: the largest award his counsel could find in California reported cases for the loss of comfort and society in the wrongful death of an adult child was $2 million"]; see also *Leming v. Oilfields Trucking Co.* (1955) 44 Cal.2d 343, 355-356 ["'The appellant's claim that the amount of damages awarded . . . is excessive, concerns an issue which is primarily factual in nature and is not therefore a matter which can be decided upon the basis of the awards made in other cases. . . . [Damages] are not excessive as a matter of law because a lesser amount has been deemed adequate compensation for a similar injury.'"].) Nor can we here.

## DISPOSITION

The judgment is affirmed.  The Phippses are to recover their costs on appeal.


SEGAL, J.


We concur:


PERLUSS, P. J.


FEUER, J.